13 CIV 5977

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

TAMMY M. FEDERMAN, derivatively on behalf of LULULEMON ATHLETICA INC.,

                    Plaintiff,

v.

CHRISTINE MCCORMICK DAY, DENNIS J. WILSON, SHEREE WATERSON, MARTHA A.M. MORFITT, MICHAEL CASEY, ROBERT BENSOUSSAN, ROANN COSTIN, WILLIAM GLENN, RHODA M. PITCHER, THOMAS G. STEMBERG, JERRY STRITZKE and EMILY WHITE,

                    Defendants,

and

LULULEMON ATHLETICA INC.,

                Nominal Defendant.

Civil Action No.

**JURY TRIAL DEMANDED**



---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.     Plaintiff Tammy Federman ("Plaintiff"), by and through her undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Lululemon Athletica Inc. ("Lululemon" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from the second quarter of 2012 to the present (the "Relevant Period"). Plaintiff makes the allegations below upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief. The allegations have been informed by an investigation that included, among other things, analysis of the Company's public filings with the U.S. Securities and Exchange Commission ("SEC") and review of news articles and other publicly available information.

Plaintiff believes that additional evidentiary support will exist for her allegations after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

2.      Lululemon is a designer and retailer of apparel and accessories for yoga and active sports. The Company has grown rapidly in recent years through the expansion of its retail outlets. Starting with one store in 1998, in 2012 the Company reported revenues of over $1 billion.

3.      The Company's clothing sells for premium prices, with yoga pants priced at approximately $100 a pair. Lululemon products are marketed as innovative, high quality products worth the high price.

4.      As described below, despite the positioning of Lululemon apparel as high quality products, the Board was on notice of a history of serious product quality control problems. The Board has learned about and addressed several "red flags" in the form of quality control issues. For example, in November 2007, shortly after the Company went public in July of that year, Lululemon withdrew claims that its clothing incorporating seaweed fiber provided health benefits after a test commissioned by the *New York Times* concluded there was no evidence of seaweed in Lululemon's clothing. Likewise, in the second quarter of 2012, consumers complained about the declining quality of the Company's clothing and reported poor construction, fraying seams and color bleeding. In September 2012, defendant Christine McCormick Day ("Day"), the Company's Chief Executive Officer ("CEO"), admitted that certain colors were bleeding. Defendant Sheree Watson ("Watson"), then the Company's Chief Product Officer, issued an apology – via Facebook – that addressed only the color bleeding issues and claimed that the problems were isolated and remedied by implementing quality

control measures.  Also in 2012, Credit Suisse analyst Christian Buss reported that the Company had transparency problems with some colors of swimwear shipped for the prior Spring as well as a subset of light colored pants.

5.     Faced with these "red flags," defendants had a duty to specifically inform themselves of the nature and extent of the Company's product quality control problems and take aggressive action to prevent them from recurring.  Defendants were also well aware of the consequences of permitting further quality control problems.  Indeed, Lululemon's reports filed with the SEC state that "our success depends on the value and reputation of the lululemon athletica brand" and on "our ability to develop and introduce innovative and high quality products" and further state that "our brand could be adversely affected if we fail to achieve these objectives or if our public image or reputation were to be tarnished by negative publicity." However, instead of ensuring that adequate quality control procedures were in place to prevent further quality issues, defendants failed to implement adequate controls, which led to a further quality problem that has severely impacted the Company's financial performance, stock price and reputation.

6.     On March 1, 2013, Lululemon stores received a new shipment of black Luon yoga pants, one of the Company's flagship revenue producing products. The fabric used was thin, overly translucent, and essentially rendered the pants see-through ("Defective Yoga Pants") when wearers bent over, as occurs in the normal and expected use of the pants.  Customer complaints swiftly and fiercely rolled in. After weeks of turmoil, defendants were forced to formally recall the Defective Yoga Pants and offer customers exchanges or refunds.  Initially, defendants blamed the defect on the Company's manufacturers and suppliers.

7.     As customer complaints mounted, and amid reports of the Defective Yoga Pants published worldwide to the detriment of the Company's reputation for quality products, on March 19, 2013, defendants announced that the Board's Compensation Committee approved an amendment to the Company's Executive Bonus Plan.  The amendment provided for a sharp increase in executive bonuses.  This announcement was made before defendants fully addressed the Defective Yoga Pants, and their financial impact on the Company.

8.     On March 21, 2013, defendants announced the Company's fourth quarter and fiscal year 2012 financial results and fiscal 2013 guidance. That day, defendants conceded that defects in Lululemon's own quality control procedures were the source of the problem with the Defective Yoga Pants.

9.     According to defendant Day, there was no way for factory inspectors to determine whether pants were see-through, which she said could only be determined when a customer put the pants on and bent over.  Echoing prior assurances that quality control problems were resolved, defendant Day gave her assurance that defendants had put much more rigorous quality control measures in place to address the problem, and were putting the product gaffes behind them.  Defendant Day also quantified the expected financial impact of the Defective Yoga Pants: lost sales and returns would result in lost revenue of $57 to $67 million, additional costs to be incurred and the write down of affected product on hand and expected to be received in the first half of fiscal year 2013, resulting in a negative impact on earnings per share of $0.25 to $0.27.  The negative financial impact of the Defective Yoga Pants was reflected in the Company's reported net revenue for the first quarter of 2013 of $345.8 million and diluted earnings per share of $0.32.

10.     In response to defendants' assurances, the price of Lululemon stock increased to $82.50 per share in intraday trading by June 10, 2013. Meanwhile, with the price of Lululemon stock artificially inflated, Lululemon founder and Chairman of the Board, defendant Dennis J. "Chip" Wilson ("Wilson") (who owned nearly 30% of the Company's stock as of March 2013), cashed in, selling 2 million shares of his personally owned stock on the open market and receiving more than $163 million in gross proceeds during a very short trading window lasting from May 10, 2013 to June 7, 2013.

11.     Defendants also mailed out Lululemon's annual proxy statement to shareholders in connection with the Company's June 11, 2013 annual general shareholder meeting soliciting proxies in favor of, among other things, Wilson's re-election as a director, which investors had to return by 11:00 pm on June 10, 2013 at the latest. By holding off on disclosing the internal turmoil at Lululemon that would result in defendant Day either stepping down or being effectively fired until after the close of business on June 10, 2013, defendants ensured that Wilson's re-election would be less problematic. Defendants also disclosed that Lululemon had been forced to discount some of its products, something defendants had long stated the Company would not do.

12.     Following the sudden announcement on June 10, 2013, after the close of trading, that defendant Day was "resigning," with no explanation or replacement in sight, the price of Lululemon stock plummeted on June 11, 2013, falling $14.43 per share, or more than 17.5%.

13.     Throughout the Relevant Period, defendants breached their fiduciary duties to the Company.   Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (1) defects in the Luon yoga pants were the result of defendants' efforts to cut costs in order to raise profit margins, resulting in diminished product quality and brand reputation; (2)

the departure of defendant Day was imminent; and (3) due to defendants' actions, the Company lacked adequate internal and product quality controls. Thus, defendants breached their fiduciary duties to Lululemon and its shareholders and have subjected the Company to substantial financial losses, additional costs, damage to its reputation and other damages.

14.     Accordingly, as a result of defendants' breaches, the Company has been damaged.

## JURISDICTION AND VENUE

15.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) as plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16.     Venue is proper in this district because some or all of the events, actions and failures to act giving rise to the claims asserted herein occurred in this District. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

17.     Plaintiff is a current shareholder of Lululemon and has continuously held Lululemon stock throughout the period of the alleged wrongdoing.  Plaintiff is a citizen of Oklahoma.

18.     Nominal defendant Lululemon is a Delaware corporation, with its principal executive offices at 400-1818 Cornwall Avenue, Vancouver, British Columbia, V6J1C7, Canada.

19.     Defendant Day has served as the Company's CEO and a director since 2008.  In June 2013, defendants announced that defendant Day would resign as CEO "when a successor is named."  As of the date of the filing of this Complaint, defendant Day remains Lululemon's CEO and continues to serve as a director.  Upon information and belief, defendant Day resides in Vancouver, Canada.

20.     Defendant Wilson, Lululemon's founder, has served as Chairman of the Board since 1998.  Previously, defendant Wilson served as the Company's Chief Innovation and Branding Officer from March 2010 until January 2012, as Chief Product Designer from December 2005 until March 2010, and as CEO from 1998 until December 2005.  Upon information and belief, defendant Wilson resides in Vancouver, Canada.

21.     Defendant Sheree Waterson ("Waterson") served as the Company's Chief Product Officer until April 15, 2013.  Previously, Waterson served as EVP, General Merchandise Management and Sourcing, beginning in June 2008.  Upon information and belief, defendant Waterson is a citizen of California.

22.     Defendant Martha A.M. (Marti) Morfitt ("Morfitt") has served as a director of the Company since December 2008.  In addition, defendant Morfitt served as Chair of the

Company's Audit Committee (the "Audit Committee") during the Relevant Period.   Upon information and belief, defendant Morfitt is a citizen of Minnesota.

23.     Defendant Michael Casey ("Casey") has served as a director of the Company since October 2007.  In addition, defendant Casey served as Chair of the Company's Nominating and Governance Committee (the "Governance Committee") and as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Casey is a citizen of California.

24.     Defendant Robert Bensoussan ("Bensoussan") has served as a director of the Company since January 2013.  In addition, defendant Bensoussan served as a member of the Governance Committee during the Relevant Period.  Upon information and belief, defendant Bensoussan resides in London, England.

25.     Defendant RoAnn Costin ("Costin") has served as a director of the Company since March 2007.  In addition, defendant Costin served as a member of the Compensation Committee during the Relevant Period.  Upon information and belief, defendant Costin is a citizen of Massachusetts.

26.     Defendant William Glenn ("Glenn") has served as a director of the Company since December 2012.  In addition, defendant Glenn served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Glenn is a citizen of New York.

27.     Defendant Rhoda M. Pitcher ("Pitcher") has served as a director of the Company since December 2005.  In addition, defendant Pitcher served as a member of the Governance Committee during the Relevant Period.  Upon information and belief, defendant Pitcher is a citizen of Washington.

28.     Defendant Thomas G. Stemberg ("Stemberg") has served as a director of the Company since December 2005.  In addition, defendant Stemberg served as a member of the Compensation Committee during the Relevant Period.  Upon information and belief, defendant Stemberg is a citizen of Massachusetts.

29.     Defendant Jerry Stritzke ("Stritzke") has served as a director of the Company since June 2012.  In addition, defendant Strizke served as a member of the Compensation Committee during the Relevant Period.  Upon information and belief, defendant Stritzke is a citizen of New York.

30.     Defendant Emily White ("White") has served as a director of the Company since November 2011.  In addition, defendant White served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant White is a citizen of California.

31.     Collectively, defendants Day, Wilson, Waterson, Morfitt, Casey, Bensoussan, Costin, Glenn, Pitcher, Stemberg, Stritzke and White shall be referred to herein as "Defendants."

32.     Collectively, defendants Morfitt, Casey, Glenn and White shall be referred to as the "Audit Committee Defendants."

33.     Collectively, defendants Casey, Bensoussan, Pitcher and Stemberg shall be referred to as the "Governance Committee Defendants."

34.     Collectively, defendants Stemberg, Costin, Pitcher and Strizke shall be referred to as the "Compensation Committee Defendants."

35.     Collectively, defendants Day, Wilson, Waterson, Costin and Pitcher shall be referred to as the "Insider Selling Defendants."

## DEFENDANTS' DUTIES

36.     By reason of their positions as officers, directors, and/or fiduciaries of Lululemon and because of their ability to control the business and corporate affairs of Lululemon, Defendants owed Lululemon and its shareholders fiduciary obligations of good faith, trust, loyalty, due care and candor, and were and are required to use their utmost ability to control and manage Lululemon in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Lululemon and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Lululemon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, Defendants have a duty to promptly disseminate accurate and truthful information concerning the Company's performance and management so that the market price of the Company's stock would be based on truthful and accurate information.

37.     Defendants, because of their positions of control and authority as directors and/or officers of Lululemon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Lululemon, each of the Defendants had knowledge of material non-public information regarding the Company.

38.     At all times relevant hereto, each of the Defendants was the agent of the other Defendants and of the Company, and was at all times acting within the scope and course of such agency.

39.   To discharge their duties, the officers and directors of Lululemon were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Lululemon were required to, among other things:

 a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

 b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

 c. Neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

 d. Establish and maintain systemic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

 e. Neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

 f. Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets and to maximize the value of the Company's stock;

 g. Remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

 h. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

40.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.   The conduct of the Defendants, who were also directors and/or officers of the Company, has been ratified by the remaining Defendants.

41.     The Defendants breached their duties of loyalty and good faith by permitting Defendants to cause, or by themselves causing, the Company to undertake the conduct that is now the subject of class action litigation alleging violations of the federal securities laws, which necessitates the Company to incur excess costs arising from Defendants' wrongful course of conduct and exposes the Company to liability in connection with that pending class action.

42.     Pursuant to the Governance Committee's Charter, one of the purposes of the Governance Committee is to provide regular updates to the Board on CEO and senior executive succession planning.  According to the Governance Committee's Charter:

> The Board views executive succession planning, as well as supporting leadership development programs, as two of its key responsibilities. These activities are integral to the Company's overall success.  With support from the Committee and Management, the Board annually reviews a detailed report on succession planning and leadership development that covers: (1) our leadership competencies; (2) the programs that support the growth and development of our current and future generation of leaders; and (3) our bench strength including identification of potential successors for each executive role, as well as other pivotal roles that are critical to the Company's success.

43.     Pursuant to the Compensation Committee charter, the members of the Compensation Committee are required, *inter alia*, to:

    a. Periodically review and advise the Board of Directors concerning the Company's overall compensation philosophy, policies and plans, including a review of both general industry and retail-specific executive compensation practices and trends in order to assess the adequacy and competitiveness of the Company's compensation programs for the Company's executive officers relative to comparable companies in the Company's industry. The Committee shall identify appropriate companies to comprise any peer group used for comparison purposes;

    b. The Committee shall review and approve the Company's goals and objectives relating to the equity and incentive compensation of the Company's executive officers, evaluate the performance of the Company's executive officers in light of performance against such goals and objectives, and set the compensations levels and incentive opportunities of the Company's executive officers based on this evaluation, all in keeping with the Committee's compensation philosophy set forth in this Charter. The Company's Chief Executive Officer (the "CEO") may not be present during the Committee's deliberations or voting of matters concerning the CEO's performance and compensation. The Committee shall consult with, and take into account the recommendations of, the CEO with respect to any matters concerning the performance and compensation of other executive officers of the Company; and

    c. The Committee shall establish and periodically review policies with respect to management perquisites and special benefits, and review and approve the benefits provided to the Company's executive officers.

44.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

    a. Review with the management the quality and adequacy of internal controls that could significantly affect the Company's financial statements, and review any special audit steps adopted in light of material control deficiencies;

    b. Review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, or the performance of the internal audit function;

    c. Discuss with management the quality and adequacy of the Company's disclosure controls and procedures;

d. Review the Company's internal quality-control procedures, other matters relating to the accounting procedures and the books and records of the Company and the correction of controls deemed to be deficient;

e. Review any material issues raised by the most recent internal quality-control review, or peer review, of the Company, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues;

f. Review the status of compliance with laws, regulations, and internal procedures, contingent liabilities and risks that may be material to the Company, the scope and status of systems designed to assure the Company's compliance with laws, regulations and internal procedures, through receiving reports from management, legal counsel and other third parties as determined by the Committee on such matters, as well as major legislative and regulatory developments, including pronouncements by the Financial Accounting Standards Board, the SEC, the Canadian securities regulatory authorities and other agencies or bodies, on the Company's financial statements;

g. Meet periodically, but no less than quarterly, with management, the Company's risk and compliance team and the Company's independent auditors to review and discuss the Company's significant financial risk exposures and the steps that management has taken to monitor, control and report such risks;

h. Regularly evaluate the Company's policies, procedures and practices with respect to enterprise risk assessment and risk management;

i. Review with the Company's counsel legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or governmental agencies;

j. Review the Company's earnings press releases, including the use of "pro-forma" or "adjusted" non-GAAP information (subject to compliance with law and applicable SEC rules, including Regulation G), as well as other publicly disclosed financial information and earnings guidance, prior to the issuance of any earnings press release, and discuss any of the foregoing with management to the extent desired by any member of the Committee; and

k. Meet to review and discuss with management the Company's quarterly and annual financial statements on Form 10-Q and 10-K, respectively.

## SUBSTANTIVE ALLEGATIONS

45.     Lululemon was founded in 1998 to market yoga wear and rapidly expanded to offer apparel and accessories for other athletic activities.  The Company went public in July 2007 and continued the expansion of its retail network.  On the success of its popular active wear, the Company reported increasing sales of approximately 30% or more for 14 straight quarters and reported net revenue of over $1 billion for its fiscal year ended January 29, 2012.  In 2008, there were 74 Lululemon stores in the United States and Canada and the Company reported net revenues of $274.7 million for its fiscal year ended February 3, 2008.  By February 2013, the Company's products were sold in 211 stores in the United States, Canada, Australia and New Zealand and the Company reported net revenue of $1.4 billion for its fiscal year ended February 2, 2013.

46.     As noted above, the Company's products are marketed as innovative, high quality performance wear worth the high price tag.  Lululemon yoga pants are priced at approximately $100 a pair.  The Company promotes the exclusivity of its products by limiting the range of sizes offered, limiting inventory and rarely discounting merchandise.  Lululemon's strict return policy also prohibits returns of merchandise more than 14 days after purchase and the return of clothing that has been worn, no longer has original tags attached or fails an inspection on return.  The Company also emphasizes grass roots and word of mouth marketing, using local ambassadors, who typically are popular and influential yoga instructors, to bolster the exclusive nature of the product.

47.     Despite the marketing position of Lululemon apparel as a high quality premium product, Defendants have experienced a number of quality control problems.  For example, in 2007 the Company marketed a line of clothing called VitaSea, which was made in part of seaweed fiber and which, according the Company's advertising, released "marine amino acids,

- 15 -

minerals and vitamins into the skin upon contact with moisture" and provided health benefits such as reducing stress and inflammation. However, as reported in the *New York Times* on November 14, 2007, a study commissioned by that newspaper found there was no significant difference in mineral levels between the VitaSea fabric and a cotton t-shirt. Following the *New York Times* article, Lulelemon complied with a decision of Canada's Competition Bureau and removed "unsubstantiated" claims of therapeutic or performance benefits from the VitaSea line.

48.    On January 6, 2012, defendant Wilson, the Company's founder, former CEO and then-current Chief Innovation and Branding Officer, announced he would leave that position but remain as Chairman of the Board.

49.    In the second quarter of 2012, Defendants faced several product quality problems. Consumers complained about the declining quality of the Company's clothing and reported poor construction, fraying seams and color bleeding. On or about July 23, 2012, defendant Waterson, then the Company's Chief Product Officer, issued an apology – via Facebook – that addressed only the color bleeding issues and claimed that the problems were isolated to "a small percentage of brightly colored fabrics" and remedied by implementing quality control measures. Defendant Waterson stated that "we have stringent testing procedures in place" and that the Company had brought in "the leading fabric and dye expert, along with additional on site quality inspection at every stage to identify potential causes." Waterson also stated that "quality is our hallmark. We know we only grow if we keep our quality and relationship promises." On September 7, 2012, during the Company's conference call to discuss second quarter 2012 financial results, defendant Day stated that there had been color bleeding but, like Waterson, minimized it as "a couple of small isolated issues which were very hard pressed to track down in a couple of other colors . . ." Day likewise stated that the Company had brought in a color expert and that "we feel very

comfortable now with the product and being able to do our strategic intent, which is push colors and maintain quality." Day also stated that "in the end, quality is our key differentiating factor. It is what we stand for and what we will always stand behind."

50.    In addition, a March 19, 2013 article published in the *Wall Street Journal* cited a report by Credit Suisse analyst Christian Buss that in Spring 2012, the Company had transparency problems with some colors of swimwear shipped for the prior Spring as well as a subset of light colored pants.

51.    Faced with these "red flags" of prior product quality problems, Defendants had a duty to specifically inform themselves of the nature and extent of the problems and take aggressive action to prevent them from recurring.   Defendants were also well aware of the consequences of permitting further quality control problems.  Indeed, the first risk factor cited in Lululemon's 10-Q for the quarter ended October 28, 2012 filed with the SEC states that "our success depends on the value and reputation of the lululemon athletica brand" and on "our ability to develop and introduce innovative and high quality products" and further states that "our brand could be adversely affected if we fail to achieve these objectives or if our public image or reputation were to be tarnished by negative publicity."   However, instead of ensuring that adequate quality control procedures were in place to prevent further quality issues, Defendants failed to implement adequate controls, which led to a further quality problem that has severely impacted the Company's financial performance, stock price and reputation.

52.    The next product quality problem faced by Defendants affected one of the Company's flagship products.   The severity of the quality problem resulted in substantial financial losses, and resulted in negative media reports worldwide that damaged Lululemon's reputation for quality.

53.     Lululemon apparel is made from, among other fabrics, a range of proprietary fabrics developed for use in yoga and workout clothes.  The Company's signature fabric is Luon, a four-way stretch fabric used in Lululemon pants, tank tops, jackets and other garments.

54.     On March 1, 2013, Lululemon stores began receiving a new shipment of the Company's black Luon yoga pants, one of the most popular products marketed by Lululemon. The fabric used was very thin, overly translucent, and essentially rendered the yoga pants see-through when wearers bent over, a normal and expected use of yoga pants.

55.     Customer reaction was swift and severe.  On March 18, 2013, Defendants caused the Company to issue a press release, which stated that:

> We have determined that certain shipments of product received from factories and available in store from March 1, 2013 do not meet our technical specifications. The items affected are certain styles of women's bottoms in our signature black Luon fabric.  The ingredients, weight and longevity qualities of the pants remain the same but the coverage does not, resulting in a level of sheerness in some our women's black Luon bottoms that fall short of our very high standards.
>
> Over the past weekend we pulled all of the affected black Luon women's bottoms from our stores, showrooms and e-commerce site and are working with the supplier to replace the fabric and our other manufacturers to replace these key items as quickly as possible.   We believe the affected items represented approximately 17% of all women's bottoms in our stores and for the near term there will be a shortage of these styles available to our guests.

56.     Also in the March 18, 2013 press release, Defendants conceded that the Defective Yoga Pants would have "a significant impact on our financial results.  Up to March 17, 2013, we were tracking to comparable–store percentage increase of 11% on a constant dollar basis and expected revenue guidance to be in a range of $350 million to $355 million for the first quarter of 2013.  Now we expect a comparable-store sales percentage increase in the range of 5-8% for the first quarter of 2013 resulting in an expected revenue range of $333 million to $343 million."

57.     While Defendants initially sought to blame the defect on the Company's manufacturers and suppliers, in a March 19, 2013 article published in the *Wall Street Journal*, the supplier, Eclat Textile of Taiwan, responded that "all shipments to Lululemon went through a certification process which Lululemon has approved," and that "all the pants were manufactured according to the requirements set out in the contract with Lululemon."

58.     The same *Wall Street Journal* article cited analysts at Sterne Agee stating that "the company doesn't appear to be exercising enough control over its supply chain" and that "we are concerned that LULU does not have the appropriate presence in and around its factories . . . it appears that there is not appropriate oversight in place."

59.     While the controversy over the Defective Yoga Pants generated a storm of negative publicity for the Company, on March 19, 2013, Defendants caused Lululemon to issue a press release and file an 8-K announcing that the Compensation Committee had approved a significant increase in the Company's executive bonus plan raising the maximum performance level for each financial performance goal and for each individual performance goal under the existing bonus plan from 150% to 200%.  A Morningstar analyst published a note on March 20, 2013, stating that "the timing [of the bonus increase] still seems pretty questionable, especially in light of the company's performance over the past year."

60.     Defendants' March 18, 2013 press release offered a full refund or exchange of the product.  However, the *Los Angeles Times* reported on March 21, 2013, that Lululemon sales associates were sticking to the Company's strict refund policy and demanding that customers put on the pants and bend over to determine whether the clothing was see-through enough to warrant a refund.  Customers understandably found this upsetting.  Moreover, in a March 21, 2013 conference call, defendant Day appeared to support the humiliating practice, saying that "the

truth of the matter is, the only way you can actually test for the issue is to put on the pants and bend over." She further conceded that "it wasn't until we got into the store and started putting it on people that we could actually see the issue." Following those reports, Lululemon clarified that returns of the pants would be accepted without question. However, as reported by the *New York Post* on March 27, 2013, a Lululemon customer service representative stated that "some stores are asking guests to try them on."

61.     Contrary to defendant Day's statements that the defect could not be detected before the pants were shipped to stores, a March 21, 2013 article published on *Bloomberg Businessweek* quoted Mark Sunderland, a professor of textile engineering at Philadelphia University, stating that "there's culpability all along the supply chain here," and that "the fact that the pants actually had to reach the customer with the problem, that's really unheard of." Similarly, an article published on *CNN Money* on March 22, 2013 cited a March 19, 2013 report by analysts at Cowen & Company that the Defective Yoga Pants never should have gotten to stores, but that the Company should have had adequate quality controls "especially since the tightness of the company's supply chain has been critical to its impressive growth."

62.     On March 21, 2013, Defendants caused Lululemon to issue a press release announcing the Company's fourth quarter 2012 and fiscal year 2012 financial results. The Company reported net revenue for the fourth quarter 2012 of $485.5 million, an increase of 31% over the prior year, and net revenue for fiscal year 2012 of $1.4 billion, a 37% increase over 2011. The press release also provided an updated financial forecast and provided additional detail about the financial impact of the Defective Yoga Pants, stating that lost revenue due to returns of defective product and the shortage of one of the Company's key products was

expected to total $57 to $67 million and result in a negative impact on earnings per share of

$0.25 to $0.27 in fiscal year 2013. The press release stated in relevant part:

> Christine Day, Lululemon's CEO, stated: "The fundamentals of our business are strong, we delivered excellent results in 2012, and we plan to continue to earn the loyalty of our customers and shareholders every day going forward. As previously announced on March 18th, we pulled a selection of our black Luon pants from our stores. Delivering the top quality our guests expect is a critical factor in our differentiation in the market place. Our proprietary fabric, black Luon, is a very technical and sensitive product to manufacture. We have a long history with our manufacturers and as we have in the past, we are working closely with them to resolve the current issues. We have a team on site collaborating with them to identify the root cause. We have recently added strong leadership in Quality Control, our Liason Office and our commercialization and development teams, and expect these people and other investments to solidify our quality consistency and our delivery capabilities."

> **Updated Outlook**

> For the first quarter of fiscal 2013, we expect net revenue to be in the range of $333 million to $343 million based on a comparable-store sales percentage increase between 5% and 8% on a constant-dollar basis. Diluted earnings per share are expected to be in the range of $0.28 to $0.30 for the quarter. This outlook reflects our current expectations of the impact from the black Luon issue, including lost revenue in the range of $12 million to $17 million, additional costs expected to be incurred and the write down of affected product on hand and expected to be received during the first half of 2013, resulting in a negative impact on EPS of $0.11 to $0.12. This guidance also assumes 146 million diluted weighted-average shares outstanding and a 30% tax rate.

> For fiscal 2013, we expect net revenue to be in the range of $1.615 billion to $1.640 billion and diluted earnings per share to be in the range of $1.95 to $1.99 for the full year. This outlook reflects our current expectations of the impact from the black Luon issue, including lost revenue in the range of $57 million to $67 million, additional costs expected to be incurred and the write down of affected product on hand and expected to be received during the first half of 2013, resulting in a negative impact on EPS of $0.25 to $0.27. This guidance also assumes a tax rate of 30% and 146.6 million diluted weighted-average shares outstanding.

63.     Also on March 21, 2013, Defendants caused the Company to file its annual report on Form 10-K (the "2012 10-K") with the SEC.  The 2012 10-K was signed by defendants Day, Wilson, Bensoussan, Casey, Costin, Glenn, Morfitt, Pitcher, Stemberg, Stritzke and White, and reiterated the Company's financial results set forth in the press release issued that same day.  The first risk factor cited in the 2012 10-K was modified from the version published in the Company's 10-Q for the quarter ended October 28, 2012 to omit the reference to high-quality products and now read:

**Our success depends on our ability to maintain the value and reputation of our brand.**

Our success depends on the value and reputation of the lululemon athletica brand. The lululemon athletica name is integral to our business as well as to the implementation of our strategies for expanding our business.   Maintaining, promoting and positioning our brand will depend largely on the success of our marketing and merchandising efforts, and our ability to provide a consistent, high-quality guest experience.   We rely on social media, as one of our marketing strategies, to have a positive impact on both our brand value and reputation. *Our brand could be adversely affected if we fail to achieve these objectives or if our public image or reputation were to be tarnished by negative publicity.  Negative publicity regarding the production methods of any of our suppliers or manufacturers could adversely affect our reputation and sales* and force us to locate alternative suppliers or manufacturing sources.   Additionally, while we devote considerable efforts and resources to protecting our intellectual property, if these efforts are not successful the value of our brand may be harmed, which could have a material adverse effect on our financial condition. [Emphasis added.]

64.     Further, the 2012 10-K set forth, in relevant part:

**Our future success is substantially dependent on the continued service of our senior management.**

*Our future success is substantially dependent on the continued service of our senior management and other key employees. The loss of the services of our senior management or other key employees could make it more difficult to successfully operate our business and achieve our business goals.*

We also may be unable to retain existing management, technical, sales and client support personnel that are critical to our success, which could result in harm to

our customer and employee relationships, loss of key information, expertise or know-how and unanticipated recruitment and training costs.

We do not maintain a key person life insurance policy on Ms. Day or any of the other members of our senior management team. As a result, we would have no way to cover the financial loss if we were to lose the services of members of our senior management team. [Emphasis added.]

65.    The foregoing statement concealed what Defendants knew about defendant Day's likely departure.  However, the foregoing statement reassured the investment community that the Defective Yoga Pants debacle was under control and that no leadership changes would be made in the near future.

66.    During a conference call held that same day, defendant Day stated with respect to the Defective Yoga Pants that Lululemon did not "want to call attention to any one particular vendor, because it would be unfair until [the Company had] completed the diagnostics." Defendant Day also stated that the Company "should have two additional sources up ready for manufacturing [its] key fabrics by the fall."  In discussing the source of the Company's "stellar" fourth quarter 2012 results, defendant Day emphasized that the Company "achieved these results in a very brand-appropriate way, and did not buy our comps through discounting, which ultimately would have harmed the brand."  Defendant Day further commented:

> *Before we talk about our fourth quarter and full year 2012 results I will give you an update to the announcement made on Monday of this week, regarding the sheerness in certain styles of our women's black Luon bottoms.*
>
> Following my comments, John will speak to our guidance. We have not yet determined the specific cause for the sheerness and are pursuing several hypotheses in parallel with our manufacturing partners to determine the root cause. What is clear to us is that this is not the Luon that we and our guests have come to love.
>
> *The process for creating Luon is complex and involves a specific set of proprietary ingredients and a multi-step production process. Even the slightest changes to the process can create meaningful changes in the fabric. We had*

*already begun putting more stringent specifications in place on the production of Luon, and we will be redoubling our efforts in this area.*

*We currently have a dedicated team working with our suppliers to identify and resolve the issue.* We have recently added strong leadership in quality control, our liaison office and our commercialization and development teams, and I expect these people and other investments to solidify our quality consistency and delivery capabilities.

*Our company is rooted in integrity, and we are ready to make the tough decisions and do the right thing for our guests and our communities. I am confident that we will recover from this setback and be stronger than ever. Our confidence is based on the history of strong performance that the team here as produced, including what we achieved during the past year.* [Emphasis added.]

67.    In response to Defendants' statements and announcements, Lululemon stock closed at $64.70 per share on March 21, 2013.

68.    On April 3, 2013, Defendants caused the Company to issue a press release entitled "lululemon announces luon production update." The press release set forth, in relevant part:

lululemon athletica inc. (NASDAQ: LULU) (TSX: LLL) today provided an update on its black luon production issues.

After an evaluation of lululemon's previously disclosed black luon production issues, the company concluded that the current specification and testing protocols for the signature fabric luon that were developed in 2006 have not materially changed. However, production of luon is a complex process with a number of different inputs, and fabric is the key factor. While the fabric involved may have met testing standards, it was on the low end of lululemon's tolerance scale and we have found that our testing protocols were incomplete for some of the variables in fabric characteristics. When combined with subtle style changes in pattern, the resulting end product had an unacceptable level of sheerness.

lululemon had taken steps prior to the black luon issue to bolster its internal product expertise, including the addition of senior level capabilities in quality, raw materials and production. This new team was instrumental in determining the root cause of the issue and has initiated three work streams to address what we believe are the contributing causes.

Work streams and actions include:

1. **Testing & processes:** lululemon's quality team is assessing all luon products in the production pipeline according to newly implemented rigorous testing and quality processes that includes revised specifications for modulus (stretch), weight and tolerances.

2. **Factory oversight:** lululemon employees have been stationed in factories to monitor and test products and will educate internal teams and manufacturing partners on new testing standards and methodologies.

3. **Leadership and structure:** lululemon is building a stronger internal structure with new leadership and cross-functional team capability that we believe will create a more robust organization to support our long-term growth strategy.

"Our stand for differentiation is the quality of our product. We have been building capacity in the product organization, and we recognize that continued investment in this segment of the business is required to support our future," said lululemon CEO Christine Day. "We are committed to continually developing best in class fabrics, and are committed to only putting product in our stores that meets our stringent standards."

Based on our evaluation to date, there is no change to the company's first quarter and fiscal 2013 earnings guidance that was provided on March 21st, 2013.

69.     The statements that quality controls were implemented are similar to defendant Waterson's statements in July 2012 in response to the color bleeding issue.

70.     Also on April 3, 2013, Defendants caused the Company to issue a press announcing that defendant Waterson would be leaving the Company effective April 15, 2013.

71.     On April 4, 2013, Lululemon stock closed at $65.66 per share.

72.     On April 30, 2013, Defendants caused the Company to file its Proxy Statement with the SEC on Form DEF 14A (the "2013 Proxy").  Among many things, the 2013 Proxy sought the re-election of defendant Wilson.  While internet voting was allowed, the 2013 Proxy stated that proxies "submitted by internet or telephone must be received by 11:00 p.m., Central Time, on June 10, 2013."  Lululemon investors were encouraged to sign and return the proxy

card even if they planned to attend the annual meeting on June 11, 2013. Moreover, the 2013

Proxy stated the following, in relevant part:

> Christine M. Day has been a member of our board of directors since July 2008.
> She served as our company's Executive Vice President, Retail Operations, from
> January 2008 through April 2008, was appointed to the offices of President and
> Chief Operating Officer in April 2008, and was named Chief Executive Officer in
> July 2008. Ms. Day previously worked at Starbucks Corporation where she served
> as President, Asia Pacific Group, from July 2004 through February 2007. From
> July 2003 to October 2003, she was Co-President for Starbucks Coffee
> International. From 1987 to 2003, she served in various capacities at Starbucks,
> including Senior Vice President, North American Finance & Administration; and
> Vice President of Sales and Operations for Business Alliances. Until December
> 2009, Ms. Day served as a member of the board of directors of Select Comfort
> Corporation, a provider of adjustable-firmness beds and other sleep-related
> accessory products. She also served on the board of directors of Nu Skin, a
> provider of personal care and anti-aging products, from May 2007 to May 2008.
> Ms. Day received her BA in Administrative Management from Central
> Washington University, and is a graduate of Harvard Business School's
> Advanced Management Program. Our board of directors selected Ms. Day to
> serve as director because she is our Chief Executive Officer and she has extensive
> experience in sales and marketing, managing retail-focused operations,
> international operations, corporate finance and strategic planning.
>
> *     *     *
>
> Currently, the positions of Chairman of the Board and Chief Executive Officer are
> held by separate persons because our board of directors has determined that this
> structure aids in the oversight of management and is in the best interests of our
> company and our stockholders at this point in time. Dennis J. Wilson currently
> serves as Chairman of the Board. Our board of directors believes that Mr. Wilson,
> as the founder of lululemon, is in a unique position to support continuity in both
> the product vision and the cultural values of our company that have been an
> integral part of our success, and that his role as Chairman of the Board enables
> him to be more effective in this role.

73.     Like the statements in the Company's 2012 10-K regarding defendant Day, the

foregoing statements reassured investors that Day would remain CEO.

74.     June 10, 2013, Lululemon stock traded as high as $82.50 per share. That day,

after the market closed (and one day before the annual meeting), Defendants issued a press

release entitled "lululemon athletica inc. Announces First Quarter Fiscal 2013 Results,

Announces CEO Transition Plan." The press release reported the Company's first quarter 2013

financial results, which slightly exceeded the guidance issued by defendant Day on March 31,

2013. Net revenues were $345.8 million, up 21% from the year prior (compared with a 52.9%

increase in net revenue from the first quarter of 2012 over the prior year) while diluted earnings

per share were $0.32, flat from the year prior. The financial impact of the Defective Yoga Pants

was apparent in the first quarter 2013 financial results.

75.    The June 10, 2013 press release further stated, in relevant part:

lululemon athletica inc. [NASDAQ:LULU; TSX:LLL] today announced financial
results for the first quarter ended May 5, 2013. lululemon also announced today
that after a five and half year tenure Christine Day will step down as the
Company's Chief Executive Officer when a successor is named. The Board has
formed a search committee and enacted its CEO succession plan. Ms. Day's
decision is being announced at this time so the Board has the benefit of a healthy
transition period, and can openly use that time for a thorough search for the next
CEO.

"Being a part of lululemon for the past five and a half years has been an incredible
journey. I am proud of building a world class team that has produced one of the
best growth, brand and profit stories in retail," said Ms. Day. "Plans have been
laid for the next five years and a vision set for the next ten. Now is the right time
to bring in a CEO who will drive the next phase of lululemon's development and
growth. I will continue to actively lead the organization while the Board searches
for a new CEO, and will work to ensure a smooth transition."

"Christine has been an exceptional leader for lululemon, successfully embracing
the culture while growing the business and returning value to all of our
stakeholders including our guests, employees, partners and shareholders," said
Chip Wilson, Chairman of the lululemon Board of Directors. "I thank Christine
for her leadership, contributions and commitment to lululemon. I am confident
that we will find the right person to lead this strong team and continue to build on
this excellent foundation."

76.    On this news, Lululemon stock plummeted $14.43 per share, or over 17.5% to

close at $67.85 per share on June 11, 2013.

77.    Despite Defendants' statements that quality control issues have been analyzed and

remedied through improved controls, procedures and staffing, consumers continue to report

quality control issues with the Company's Luon yoga pants. As reported in the Canadian

*Financial Post* on July 10, 2013, a recent report by securities analyst Liz Dunn of Macquarie Research stated the "we believe the quality, post restocking, is still not up to brand standards, and the customer reviews online support our view." Consumer reviews are important for Lululemon, which emphasizes word-of-mouth marketing. The same article cited confusing responses by Lululemon staff to consumer complaints, such as telling customers who complained that pants did not wick away sweat that the pants "were not for sweating" – an unexpected response regarding athletic wear. Likewise, some customers who complained about sheer yoga pants report that the Company is blaming the customer for buying a size too small. These allegations demonstrate that the quality control improvements announced by Defendants may be incomplete, or even illusory. Ms. Dunn was also quoted in a *Canadian Press* article published on July 11, 2013 stating that "we see a narrow window of opportunity for Lululemon to really fix quality," otherwise "customers may jump ship to competing brands."

78.     Accordingly, as a result of Defendants' breaches of their fiduciary duties, the Company has been damaged. The Company's damages include, but are not limited to: (1) the decline in the Company's stock price caused by Defendants' conduct; (2) costs incurred in litigating the securities fraud class action brought against the Company and any judgment or settlement thereto; (3) costs incurred in any regulatory investigations of the stock sales listed below; and (4) costs incurred from compensation and benefits paid to the Defendants who have breached their duties to the Company, particularly in connection with the approval of the amended bonus plan announced on March 19, 2013.

79.     Moreover, the actions taken by the Defendants have irreparably damaged Lululemon's corporate image, reputation and goodwill and risk alienating the Company's loyal customer base.

## INSIDER SELLING DEFENDANTS' ALLEGATIONS

80.     In December 2012, defendant Wilson set up a prearranged 10b5-1 trading plan (the "Trading Plan"), which would allow him to sell Lululemon stock on a semi-regular basis. Upon information and belief, the plan would allow him to sell up to 5.7 million shares of Lululemon stock over an eighteen month period.  While the timing may have been set up in advance, it is not clear that the amounts were.  However, pursuant to the Trading Plan, defendant Wilson sold 607,545 shares of his Lululemon stock on June 6, 2013 at $81.50 per share for proceeds of $49.5 million, immediately before defendant Day's resignation announcement would send Lululemon shares tumbling.  An article in the *Wall Street Journal* states that defendant Wilson's sale was made on the day that the Company's Board was notified that defendant Day intended to resign.  The following Tuesday, June 11, 2013, the day after defendant Day's departure was announced, the price of Lululemon stock fell more than 17% to $67.85 per share. Had defendant Wilson waited until June 11, 2013 to make that trade, his proceeds would have been approximately $41.2 million, or over $8 million less.  Nor were these defendant Wilson's only sales.  Between March 2013 and June 2013, defendant Wilson sold 2 million shares of his Lululemon stock pursuant to the Trading Plan, reaping proceeds of *over $163 million*.

81.     Between December 2012 and June 10, 2013, and while in possession of material, adverse, non-public information, the Insider Selling Defendants sold over 2.2 million shares of their personally held Lululemon stock, reaping proceeds of nearly *$180 million*.

82.     As reported by *Yahoo! Finance*, insider trading by the Insider Selling Defendants between December 2012 and the June 10, 2013 press release announcing the resignation of defendant Day is set forth in the following chart:

| Date | Insider | Shares | Transaction | Value |
|---|---|---|---|---|
| June 6, 2013 | Wilson | 607,545 | Automatic Sale at $81.50 per share. | $49,514,917 |
| June 3, 2013 | Wilson | 392,455 | Automatic Sale at $81.84 - $82.31 per share. | $32,211,000 |
| May 20, 2013 | Wilson | 375,214 | Automatic Sale at $81.68 per share. | $30,647,479 |
| May 19, 2013 | Wilson | 2,201 | Automatic Sale at $81.25 per share. | $178,831 |
| May 16, 2013 | Wilson | 37,862 | Automatic Sale at $81.26 per share. | $3,076,666 |
| May 15, 2013 | Wilson | 6,532 | Automatic Sale at $81.30 per share. | $531,051 |
| May 14, 2013 | Wilson | 159,188 | Automatic Sale at $81.40 per share. | $12,957,903 |
| May 13, 2013 | Wilson | 397,351 | Automatic Sale at $81.38 per share. | $32,336,424 |
| May 12, 2013 | Wilson | 2,977 | Automatic Sale at $81.25 per share. | $241,881 |
| May 9, 2013 | Wilson | 18,675 | Automatic Sale at $81.25 per share. | $1,517,343 |
| Mar 28, 2013 | Day | 19,665 | Disposition (Non Open Market) at $62.35 per share. | $1,226,112 |
| Mar 28, 2013 | Waterson | 8,653 | Disposition (Non Open Market) at $62.35 per share. | $539,514 |
| Dec 20, 2012 | Costin | 46,366 | Sale at $75.71 - $76.09 per share. | $3,519,000 |
| Dec 17, 2012 | Pitcher | 16,466 | Sale at $76 - $76.31 per share. | $1,254,000 |
| Dec 16, 2012 | Waterson | 45,000 | Sale at $75.43 - $75.49 per share. | $3,396,000 |
| Dec 13, 2012 | Day | 21,666 | Sale at $75 per share. | $1,624,950 |
| Dec 12, 2012 | Casey | 1,316 | Sale at $74.65 per share. | $98,239 |
| Dec 11, 2012 | Casey | 1,300 | Sale at $73.80 per share. | $95,940 |
| Dec 10, 2012 | Day | 47,666 | Sale at $72.25 - $73 per share. | $3,462,000 |
| Dec 9, 2012 | Day | 2,334 | Sale at $73 per share. | $170,382 |
| TOTALS | | 2,210,432 | | $178,599,632 |

## DERIVATIVE AND DEMAND ALLEGATIONS

83.     Plaintiff brings this action derivatively in the right and for the benefit of Lululemon to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty and other violations of law by Defendants.  The Company is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

84.     Plaintiff will adequately and fairly represent the interests of Lululemon and its shareholders in enforcing and prosecuting its rights.

85.     At the time this action was commenced, the Board consisted of the following eleven (11) directors: Day, Wilson, Bensoussan, Casey, Costin, Glenn, Morfitt, Pitcher, Stemberg, Stritzke and White.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

   a.  During the Relevant Period, defendants Day, Wilson, Costin and Pitcher each illicitly sold shares of Lululemon stock while in possession of material, adverse, non-public information, during a time in which Lululemon stock was artificially inflated due to Defendants' false and misleading statements.  As a result of these illicit sales, defendants Day, Wilson, Costin and Pitcher each received direct financial benefits not shared with Lululemon shareholders, and are therefore each directly interested in a demand.  Further, defendants Day, Wilson, Costin and Pitcher each are interested in a demand because they face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith.  Accordingly, demand upon Day, Wilson, Costin and Pitcher is futile;

   b.  During the Relevant Period, each of the Defendants was on notice of several prior product quality control issues with respect to Lululemon apparel and consciously disregarded the several "red flag" warnings raised by those prior quality control problems indicated systemic problems with the Company's internal controls. Each of the Defendants was aware of the 'red flags' either by management through existing and necessary internal board reporting

processes, or through the Company's reports filed with the SEC or via publicly disseminated media reports. Defendants Stemberg, Pitcher, Costin, Casey, and Wilson have all been directors since before the first alleged "red flag" was reported in November 2007. Moreover, the Company's legal violations were systemic, widespread and sustained and uncorrected for years, undermining any inference of legitimate ignorance by any Board member;

c.  During the Relevant Period, defendants Casey, Glenn, Morfitt and White served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls. Defendants Casey, Glenn, Morfitt and White breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures. Therefore, defendants Casey, Glenn, Morfitt and White each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

d.  During the Relevant Period, defendants Bensoussan, Casey, Pitcher and Stemberg served as members of the Governance Committee. Pursuant to the Company's Governance Committee Charter, the members of the Governance Committee were and are responsible for, *inter alia*, activities and communications related to executive succession planning. Defendants Bensoussan, Casey, Pitcher and Stemberg breached their fiduciary duties of due care, loyalty, and good faith, because the Governance Committee, *inter alia*, allowed or permitted the Company to issue the false and misleading 2013 Proxy and 2012 10-K, which concealed the fact that defendant Day would be imminently resigning from the Company, and allowed or permitted the Company to completely conceal this fact from investors until the night before the annual meeting, when most of the proxy votes had already been cast. Therefore, defendants Bensoussan, Casey, Pitcher and Stemberg each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

e.  During the Relevant Period, defendants Stemberg, Costin, Pitcher and Strizke served as members of the Compensation Committee. Pursuant to the Compensation Committee charter, members of the Compensation Committee are responsible for reviewing and approving executive compensation. Defendants Stemberg, Costin, Pitcher and Strizke approved the amended bonus plan announced on March 19, 2013, during the controversy over the Defective Yoga Pants. Therefore, defendants Stemberg, Costin, Pitcher and Strizke each face a substantial likelihood of liability for their breach of fiduciary duties and any demand on them is futile;

- 32 -

f.  The principal professional occupation of defendant Day is her employment with Lululemon as CEO, pursuant to which she has received and continues to receive (as of the filing of this Complaint) substantial monetary compensation and other benefits.   In addition, according to the 2013 Proxy, Defendants have admitted that defendant Day is not independent.   Moreover, defendant Day is directly interested in this action due to her sales of her personally held Lululemon stock.    Thus, defendant Day lacks independence from demonstrably interested directors, rendering her incapable of impartially considering a demand to commence and vigorously prosecute this action.   In addition, defendant Day faces a substantial likelihood of liability for breach of fiduciary duties in connection with the sales of her personally held Lululemon stock;

g.  The principal professional occupation of defendant Wilson (the Company's founder and current Chairman) over the years has been his employment with Lululemon as its CEO, Chief Innovation and Branding Officer, and Chief Product Designer, pursuant to which he received substantial monetary compensation and other benefits.   Additionally, defendant Wilson indirectly owns the company 0823038 BC Ltd., which owns the land and building in which Lululemon's Victoria, BC store is located.   Lululemon leases the space from 0823038 BC Ltd. for CDN$7,292 per month, with the lease scheduled to continue until June 30, 2017.   Further, Lululemon has made payments totaling $295,117 in fiscal 2012 to Conrad Group, Inc., a company that provides personal and professional development coaching to Lululemon employees and which is owned by defendant Wilson's sister-in-law, Susanne Conrad.   In addition, according to the 2013 Proxy, Defendants have admitted that defendant Wilson is not independent.   Moreover, defendant Wilson is directly interested in this action due to his sales of his personally held Lululemon stock.    Thus, defendant Wilson lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.   In addition, defendant Wilson faces a substantial likelihood of liability for breach of fiduciary duties in connection with the sales of his personally held Lululemon stock;

h.  Defendants Day, Wilson, Bensoussan, Casey, Costin, Glenn, Morfitt, Pitcher, Stemberg, Stritzke and White (*i.e.* the entire Board) signed the false and misleading 2012 10-K, which was false and misleading because (among other things) it concealed the fact that defendant Day's departure was imminent. Thus, defendants Day, Wilson, Bensoussan, Casey, Costin, Glenn, Morfitt, Pitcher, Stemberg, Stritzke and White each faces a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

i.  The entire Board and senior management participated in the wrongs complained of herein.  For the reasons above, the Company's directors are not disinterested or independent.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs.  Each of the above-reference Defendants breached the fiduciary duties they owed to the Company and its shareholders in that they failed to prevent and correct the serious product quality issues alleged herein.  Thus, the Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome since their actions have subjected the Company to millions of dollars in potential liability for violation of the federal securities laws; and

j.  The conduct alleged herein could not have been the product of good faith business judgment, and each of the Defendants faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected the Company to substantial damages.

## FIRST CAUSE OF ACTION
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

86.  Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

87.  Defendants owed and owe Lululemon fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe Lululemon the highest obligation of good faith, fair dealing, loyalty and duty of care.

88.  As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's statements were reported accurately, and, when put on notice of problems with the Company's business practices, product quality controls, internal controls, and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

89.  Defendants willfully ignored the obvious and pervasive problems with Lululemon's product quality controls, internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

90.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

91.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Lululemon has sustained damages, not only monetarily, but also to its corporate image, reputation and goodwill.

## SECOND CAUSE OF ACTION
### AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

92.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as fully set forth herein.

93.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Lululemon, for which they are legally responsible.    In particular, Defendants abused their positions of authority by causing or allowing Lululemon to misrepresent material facts regarding its product quality controls, internal controls and operations.

94.    As a direct and proximate result of Defendants' abuse of control, Lululemon has sustained significant damages.

95.    As a result of misconduct alleged herein, Defendants are liable to the Company.

96.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## THIRD CAUSE OF ACTION
### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

97.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

98.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Lululemon.

99.    Plaintiff, as a shareholder and representative of Lululemon, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits,

benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## FOURTH CAUSE OF ACTION
### AGAINST THE INSIDER SELLING DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION

100.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

101.    At the time of the stock sales set forth herein, the Insider Selling Defendants were in possession of material, adverse, non-public information described above, and sold Lululemon common stock on the basis of such information.

102.    The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects.    It was a proprietary asset belonging to the Company that the Insider Selling Defendants used for their own benefit when they sold Lululemon common stock.

103.    At the time of their stock sales, the Insider Selling Defendants knew that defendant Day's departure was imminent (which would have a profound impact on the value of Lululemon stock) and that Defendants would be forced to sell the Company's yoga pants at a discounted price in order to obtain sales and protect market share.    The Insider Selling Defendants' sales of Lululemon common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

104.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing Lululemon to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and quality control and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to Lululemon restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 23, 2013

James E. Tullman
Richard A. Acocelli
WEISSLAW LLP
1500 Broadway, 16th Floor
New York, NY 10036
(212) 682-3025
(212) 682-3010 (facsimile)
jtullman@weisslawllp.com
racocelli@weisslawllp.com

*Counsel for Plaintiff*

## VERIFICATION

I, Tammy M. Federman, declare that I have reviewed the Complaint ("Complaint") prepared on behalf of Lululemon Athletica Inc. [NASDAQ: LULU], and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder of Lululemon Athletica Inc. common stock during the relevant time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

8-15-13
Date

Tammy M. Federman