UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THOMAS CANTY, derivatively on behalf of LULULEMON ATHLETICA INC., | : | Index No. 13 CIV 5629 (KBF) |
| Plaintiff, | : | |
| v. | : | |
| CHRISTINE MCCORMICK DAY, DENNIS J. WILSON, JOHN E. CURRIE, SHEREE WATERSON, MARTHA A.M. MORFITT, MICHAEL CASEY, ROBERT BENSOUSSAN, ROANN COSTIN, WILLIAM GLENN, RHODA M. PITCHER, THOMAS G. STEMBERG, JERRY STRITZKE and EMILY WHITE, | : | |
| Defendants, | : | |
| and | : | |
| LULULEMON ATHLETICA INC., | : | |
| Nominal Defendant. | : | |



| | | |
|---|---|---|
| TAMMY M. FEDERMAN, derivatively on behalf of LULULEMON ATHLETICA INC., | : | Index No. 13 CIV 5977 (KBF) |
| Plaintiff, | : | |
| v. | : | |
| CHRISTINE MCCORMICK DAY, DENNIS J. WILSON, SHEREE WATERSON, MARTHA A.M. MORFITT, MICHAEL CASEY, ROBERT BENSOUSSAN, ROANN COSTIN, WILLIAM GLENN, RHODA M. PITCHER, THOMAS G. STEMBERG, JERRY STRITZKE and EMILY WHITE, | : | |
| Defendants, | : | **JURY TRIAL DEMANDED** |
| and | : | |
| LULULEMON ATHLETICA INC., | : | |
| Nominal Defendant. | : | |

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

1.     Plaintiffs Thomas Canty and Tammy M. Federman (collectively, "Plaintiffs"), by and through their undersigned attorneys, hereby submit this Verified Amended Shareholder Derivative Complaint (the "Complaint") for the benefit of Nominal Defendant Lululemon Athletica, Inc. ("Lululemon" or the "Company") against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy Defendants' breaches of fiduciary duties and unjust enrichment from 2012 to the present (the "Relevant Period")

## NATURE OF THE ACTION

2.     This derivative action is about directors and officers who repeatedly either condoned or turned a blind eye to serious quality control problems with Lululemon's products -- athletic wear sold at a high price based upon Defendants' representations as to its high quality -- and simultaneously issued a series of materially false and misleading statements.  While in possession of material, adverse, non-public information regarding those quality control issues, certain of those individuals, including members of the Board, sold nearly two hundred million dollars' worth of their Lululemon stock at artificially inflated prices.  And, in at least one particular instance, the Board carefully timed a negative disclosure in order to maximize the value of a massive, planned insider sale by Defendant Dennis J. "Chip" Wilson ("Wilson"), the Company's founder, Chairman, largest shareholder, and by far, its most influential figure.  This action, brought derivatively on behalf of Lululemon, seeks to hold Defendants liable for their non-exculpable breaches of the fiduciary duties of good faith, due care and loyalty, and other serious misconduct.

3.     Lululemon derives virtually all of its revenues from designing and selling "high-end" athletic apparel and accessories, most notably yoga pants, shorts, and tops.  Lululemon's business model is based on selling high-quality garments at high prices (approximately $100 per

pair of pants and $60 per shirt), offering minimal discounts to consumers, and keeping only a small inventory of products available in its stores in order to perpetually drive demand. Over the years, Defendants have explained the higher prices charged for Lululemon's products by publicly touting and emphasizing the supposed "premium quality" of those products.

4.      Lululemon has become one of the fastest growing retailers in North America and has been hailed on Wall Street as a quintessential "growth story." Indeed, the Company's sales of purportedly the highest-quality athletic apparel have driven enormous growth. For example, between 2009 and 2012, Lululemon's annual revenues and gross profits quadrupled. During that same time period, Lululemon also met or exceeded analyst expectations for virtually all key financial metrics, and the price of Lululemon stock skyrocketed, from approximately $4 per share to approximately $70 per share; a 1,650% increase in only four years.

5.      Lululemon's most important and popular products are women's fitness pants designed from the black colored proprietary material called "Luon," which consists of 86% nylon and 14% Lycra. The Company's tighter-fitting silhouette "bottoms" (clothing worn on the bottom half of one's body) are manufactured from Luon fabric. Black-colored Luon bottoms accounted for at least 17% of the Company's sales of women's bottoms, and 6% of the Company's overall sales -- or *$80 million* during 2012 alone. In addition to being the Company's most popular and well-known products, black Luon bottoms also have one of the highest profit margins of any of Lululemon's products, and sales of black Luon bottoms often result in additional "add-on" sales of other Lululemon products.

6.      While Defendants claimed publicly over the years, both before and during the Relevant Period, that Lululemon's exceptional growth purportedly came at no cost to the Company, in reality, as alleged in detail herein, quality control was sacrificed for the sake of growth. Despite the very successful and lucrative positioning of Lululemon's apparel in the

marketplace -- including black Luon bottoms -- as products of the highest quality, Defendants, including the members of the Board, were repeatedly put on notice of "red flags" regarding various serious quality control problems. Indeed, Lululemon has a well-publicized and notorious history of quality control issues.

7.     For example, in November 2007 (mere months after Lululemon became a publicly traded company), a *New York Times* investigation revealed that the Company's "Vitasea" line of seaweed fabric -- which Lululemon claimed released "marine amino acids, minerals, and vitamins into the skin" -- in fact contained no seaweed at all. Lululemon was forced to apologize for and withdraw its prior claims of health benefits provided by the "Vitasea" line of products following the *New York Times* report, and, in addition, Wilson was forced to concede publicly that the Company had in fact not conducted any tests to confirm whether the Vitasea products lived up to the Company's claims.

8.     In December 2010, yet another high-profile product quality issue arose when it was revealed that the Company shipped and distributed reusable shopping bags beginning in February 2010 (to coincide with the Winter Olympics occurring in Vancouver, where Lululemon is headquartered) that had been printed using ink that contained high levels of lead. Defendants publicly stated at the time that such product quality issues would not happen again at Lululemon in the future.

9.     In 2011 and 2012, however, Lululemon experienced still more high-profile quality control issues, and significantly, these quality control problems at least in part *involved Lululemon's core products manufactured with the Company's proprietary Luon fabric*. Specifically, in late 2011 and early 2012, many customers complained that Lululemon's garments were defective because their colors "bled" during the very exercise activities for which the products were designed, marketed and sold. Notably, Luon was one of the fabrics used in the

manufacture of these defective "bleeding" garments, and the "bleeding" issues were in fact so pervasive that warnings were eventually placed on them and/or they were pulled from Lululemon's store shelves altogether. In addition, Lululemon stated that it would accept returns, *carte-blanche*, for any affected "bleeding" item.

10.     Further, in the spring of 2012, many customers reported that Lululemon's swimwear was subject to both color bleeding and "sheerness" problems. Specifically, certain swimwear bled whenever it came into contact with sweat or water, while other swimwear became completely sheer when wet -- in other words, the products were essentially useless for their intended function. Notably, a Credit Suisse analyst, Christian Buss, reported that the Company was experiencing "transparency" problems not only with its swimwear in certain colors, but with a subset of light colored pants as well.

11.     Accordingly, in September 2012, Defendant Christine McCormick Day ("Day"), Lululemon's then-Chief Executive Officer ("CEO") and a member of the Board, publicly admitted that certain colors in the Company's products were "bleeding." Defendant Sheree Waterson ("Waterson"), then the Company's Chief Product Officer, issued a public apology, but also claimed that the problems were isolated and had been purportedly remedied by the implementation of certain quality control measures.

12.     Given these events and public statements, the Defendants, including all of the members of the Board, knew or should have known by September 2012 at the very latest of the Company's quality control issues with respect to the proprietary Luon fabric used in the manufacture of the Company's core products, including "transparency" issues plaguing certain products. Faced with repeated "red flags" in the form of numerous highly-publicized, serious, and embarrassing quality-control problems, and public statements and reports about those problems, Defendants -- including every member of the Board -- were affirmatively duty-bound

to take steps to: (a) specifically inform themselves of the precise nature and full extent of the Company's serious product quality control problems; and (b) take action to put a stop to those problems and prevent those and other similar problems from recurring. Indeed, as a Morgan Stanley analyst report stated following the Company's quality control issues in 2011 and 2012, "[t]he Street is worried about competitors impacting LULU, but we are more worried about what LULU may do to itself . . . LULU must take steps to ensure it maintains the highest quality product standards in the industry . . . ."

13. Critically, because the Company's business model depends on selling high quality sports apparel at high prices, Defendants were well-aware of the severe consequences of continued quality control problems. Indeed, in Lululemon's public filings with the U.S. Securities and Exchange Commission (the "SEC"), Defendants expressly acknowledged that "[Lululemon's] success depends on the value and reputation of the lululemon athletica brand" and on "our ability to develop and introduce innovative and high quality products," and further warned that "our brand could be adversely affected if we fail to achieve these objectives or if our public image or reputation were to be tarnished by negative publicity."

14. Instead of taking affirmative steps to properly and fully inform themselves and take action to stop and prevent further quality control issues, however, despite their own warnings and other public statements, Defendants turned a blind eye as each such problem occurred. This, in turn, led to the Company's largest, most embarrassing, and serious quality-control incident in its history, which surfaced publicly in March 2013 and severely impacted the Company's financial performance, business prospects and reputation.

15. On March 18, 2013, Defendants were forced to announce that they were conducting a massive recall of one of Lululemon's flagship products – its black Luon yoga pants – when it was revealed that those pants were so sheer and poorly-constructed that they were

- 5 -

actually see-through (the "Black Luon Recall"). Specifically, Defendants disclosed that "[t]he ingredients, weight and longevity qualities of the pants remain the same but the coverage does not, resulting in a level of sheerness in some of our women's black Luon bottoms that falls short of our very high standards."

16.    The Black Luon Recall iinvolved black Luon yoga pants that accounted for at least 17% of the Company's overall sales of women's pants,[1] and accordingly the Black Luon Recall had a devastating financial impact on the Company, wiping out between $40-45 million in revenue over the first and second quarters of 2013. Defendants subsequently were forced to admit that, contrary to their public representations that they were "maniacal about protecting [the Company's high quality Luon] standard," in reality the Company's quality control procedures were grossly deficient. Indeed, the serious defects in Lululemon's black Luon pants would have been readily apparent had Defendants ensured that Lululemon employed even the most rudimentary quality control practice: namely, having an individual try on the pants prior to shipment, to ensure the integrity and quality of the product. However, Defendants failed to ensure that even this most basic means of apparel quality control was employed.

17.    The importance of implementing and employing quality control procedures of the highest order (let alone merely "adequate" or "industry standard" procedures) was well-known to Defendants, because according to Defendants themselves, high product quality was the primary differentiating factor between Lululemon and its competitors. Specifically, Lululemon products are sold at prices far in excess of the prices charged by Lululemon's competitors, precisely because Defendants have repeatedly claimed that the Company's products are of "superior"

---

[1] As of January 2013, women's garments accounted for an overwhelming **88%** of Lululemon's overall sales. *See* http://www.nydailynews.com/life-style/health/lululemon-reaches-new-customer-base-men-article-1.1393066.

quality. Indeed, Defendants claimed that the "key differentiating factor" that gave the Company a "competitive advantage" over its peers was that its product quality was "the highest in the industry."

18.     Analysts likewise recognized the importance of high product quality for the Company, and routinely warned that if the Company did not maintain superior product quality, Lululemon customers would "switch to cheaper alternatives," noting that "persistent quality issues, even minor ones" could "risk damaging [Lululemon's] brand image" and "open[] the door for competition."

19.     Given the paramount importance of high product quality to the Company's business plan, each instance of publicly reported quality control issues was swiftly met with Defendants' assurances that the Company's quality control problems had been corrected, that they had put in place more comprehensive quality control processes, and that they were working "closely" with an outside testing company and its manufacturers to ensure that the quality of all Lululemon products remained the "highest in the industry."

20.     Defendants likewise claimed that Lululemon's products "are created using the highest quality suppliers and manufacturers" and that "[i]n the end, quality is our key differentiating factor.  It is what we stand for and what we will always stand behind."  As discussed herein, Defendants' repeated claims were undoubtedly false and misleading, as Defendants had not, in fact, taken the necessary steps to put a stop to and guard against the serious quality control issues that had repeatedly plagued and threatened the Company.

21.     The Black Luon Recall, announced on March 18, 2013, gave the lie to Defendants' repeated representations of high product quality and quality controls.  The Black Luon Recall – involving the recall of hundreds of thousands of pairs of pants – resulted in Defendants being forced to drastically cut their previously-issued earnings per share ("EPS")

- 7 -

estimates for fiscal year 2013 by $0.25-$0.27, or 12%, and caused Lululemon's stock price to materially decline. As noted by one market commentator at the time that the Black Luon Recall was announced, "this is one of the largest yoga apparel makers out there, so nearly a fifth of their inventory is a lot of yoga pants."[2]

22.    Significantly, especially in light of the Company's prior quality-control problems with both items manufactured with Luon fabric and garments that were "transparent," upon announcing the Black Luon Recall Defendants quickly attempted to shift the blame from themselves and onto one of the Company's suppliers in Taiwan -- Eclat Textile Co., Ltd ("Eclat"). According to Defendants' March 18, 2013 press release, Lululemon had "used the same manufacturing partner on key fabrics since 2004. . . . [and the defect] is not the result of changing manufacturers or quality of ingredients. [Lululemon is] working closely with them to understand what happened during the period this fabric was made."

23.    Eclat, however, swiftly and firmly refuted Defendants' claims that Eclat was to blame for the Company's black Luon pants transparency fiasco. In an article entitled "Yoga-Pants Supplier Says Lululemon Stretches the Truth," published by *The Wall Street Journal* (the "*WSJ*") on March 19, 2013, Eclat's Chief Financial Officer ("CFO") placed the responsibility for the product defects squarely on Lululemon, indicating that the Company had lowered its quality standards for pants. Specifically, Eclat's CFO stated that the Luon pants Eclat produced and shipped to Lululemon were in full compliance with the Company's own production guidelines. According to Eclat's CFO, "all shipments to Lululemon went through a certification process which Lululemon had approved. All the pants were manufactured according to the requirements

---

[2]  *See* http://www.thewire.com/business/2013/03/lululemons-too-thin-yoga-pants-fiasco-could-cost-company-20-million/63261/

set out in the contract with Lululemon."  Notably, Defendants did not disclose that they had lowered Lululemon's production guideline standards.

24.    Similarly, on March 20, 2013, *The Globe* published an article entitled "Supplier Insists It Stuck To Lululemon Design: Eclat Textile Says It 'Did Follow Their Instructions' As Fallout Over Recalled Pants Leads To Analysts Downgrading Company," quoting Eclat's CFO as stating that Eclat had "checked our orders this morning and indeed, we did follow their instructions to make the product.  Lululemon introduced the product to the market and their customers are not comfortable with its opacity."  In this article, Eclat's CFO also noted that **Lululemon had not even contacted Eclat yet** regarding the black Luon pants transparency issue even though per Defendants' March 18, 2013 press release they had been made aware of the problem by March 11, 2013 -- directly contradicting Defendants' public claims made on March 18, 2013 that they were purportedly "working closely" with Eclat "to understand what happened."

25.    Obviously, Defendants' misguided, misleading, and weak attempts to shift the blame away from themselves and onto Eclat were unsuccessful.  As Defendants ultimately were forced to concede in a series of announcements made between March 21, 2013 and April 3, 2013, Lululemon's quality-control procedures and oversight over its manufacturing process were inadequate and caused the Luon product defects.

26.    Contrary to their earlier public statements touting the high quality of the Company's products and the purported strength of its quality control processes, and shockingly in light of the fact that the Company had previously experienced serious quality control issues in 2011 and 2012 with respect to: (a) Luon fabrics and (b) sheerness (involving both swimwear and pants, at least), Defendants admitted that the Company somehow inappropriately failed to employ a live model test, and that its "testing protocols were incomplete," resulting in the

production and sale of products with an "unacceptable level of sheerness." Defendants also admitted that adequate quality control tests for evaluating the stretch, weight and tolerances of Lululemon bottoms were lacking, that Lululemon's quality assurance personnel were inadequately trained and inexperienced, and that sufficient oversight was not exercised on the ground in Taiwan over the manufacturing processes.

27.    Nonetheless, Defendants claimed that they instituted new, more comprehensive quality control tests, and further announced on April 3, 2013 that Defendant Waterson, who had served as Lululemon's Chief Product Officer and who had issued a public apology in 2012 for Lululemon's quality control problems, would be departing the Company.

28.    Only nine days later, on April 12, 2013, Defendants caused the Company to announce a recall of all pants known as "Candy Stripe Wunder Under Crops" from its stores worldwide. These pants were also manufactured with Luon fabric, and like the black Luon yoga pants that were recalled one month earlier in the Black Luon Recall, they too were transparent and thus defective.

29.    Next, approximately two months later, on Monday, June 10, 2013, Defendants announced in a press release that Day, who had served as CEO of the Company and as a Board member for more than five years and throughout its incredible "growth story," was purportedly "resigning."[3] The abrupt and unexpected announcement of Day's "resignation," coming directly on the heels of the worst, highest-profile quality-control problem in Lululemon's history, caused the Company's stock price to plummet by *22%* over the next two days, or $18 per share.

30.    No reason was given by Defendants in the June 10, 2013 press release announcing Day's surprise "resignation."    As *CNNMoney.com* reported, "there's a mysterious air

---

[3] Defendants further announced on June 10, 2013 that the Company was forced to take a $17.5 million write-off due to the Black Luon Recall,

surrounding Day's decision to leave" and the "announcement that [Day is] leaving Lululemon has left many scratching their heads." When questioned regarding the reasons for her mysterious and sudden departure, Day only stated that "[m]y values include discretion."[4]

31.     Less than three months before the announcement that Day was leaving Lululemon, on March 21, 2013, Defendants warned in the Company's Annual Report on Form 10-K that the Company's "future success [was] substantially dependent on the continued service of our senior management," and of course this included Day, who served as CEO throughout a multi-year period of explosive growth.[5] Thus, it was highly suspicious, as the *WSJ* pointed out in an article entitled "Timing of Stock Sales Favors Lululemon Insider," published on June 12, 2013, that Wilson "*sold $50 million worth of stock in the company four days before the shares plummeted on the unexpected news that the yoga-gear maker's chief executive would step down.*"

32.     Defendant Wilson's massive insider sales, as the *WSJ* observed, were made pursuant to a pre-arranged stock trading plan that Wilson agreed to in December 2012 (the "Trading Plan").[6] As the *WSJ* reported, however, the entire Board (including Wilson), but not the public, was aware of Day's "resignation" on Friday, June 7, 2013 – *the very same day that Wilson executed his massive insider sale of more than 607,000 shares for $49.5 million*.

33.     Incredibly, although the full Board was aware of Day's "resignation" on June 7, 2013, the Board nevertheless *waited* to announce Day's departure as CEO *until the end of the*

---

[4] http://management.fortune.cnn.com/2013/06/14/lululemon-christine-day-3/.

[5] As the *WSJ* reported on January 13, 2014, "[d]uring Ms. Day's tenure, Lululemon enjoyed tremendous growth.  Revenue rose to $1.4 billion in the fiscal year ended Feb. 3, 2013 from $270 million in 2008, the fiscal year before Ms. Day joined."

[6] Notably, upon information and belief, while Wilson's insider sales were purportedly "pre-arranged" per the Trading Plan, there were no limits placed on Wilson's discretion regarding the size of the sales.

*next trading day*, which was Monday, June 10, 2013.  Lululemon's stock fell by more than *17%* on Tuesday, June 11, 2013 to $67.85 per share on the news of Day's "resignation."  As the *WSJ* reported , "[a] sale at that price would have brought Mr. Wilson about *$8 million less* than he reaped by selling his stock the previous week."  As one market observer put it, Wilson's massive insider sales and the subsequent "surprise" announcement of Day's "resignation" that the Board knew about days earlier "*should make any sane person stop and question the timing of these developments*."[7]

34.   Also prior to the announcement of Day's departure from Lululemon, Defendants filed with the SEC and disseminated to shareholders Lululemon's annual proxy statement (the "2013 Proxy") in connection with the Company's June 11, 2013 annual general shareholder meeting.  In the 2013 Proxy, the Defendants solicited shareholder votes in favor of, among other things, Defendant Wilson's re-election as a director.  Shareholders were required to return their votes by 11:00 pm on June 10, 2013.  Notably, the 2013 Proxy contained no indication of any of the material internal disruptions on-going at the Company that ultimately resulted in Day's departure.  By concealing these material facts, Defendants acted to facilitate Wilson's re-election.

35.   Despite the considerable fallout following the Black Luon Recall, Defendants continued in their egregious fiduciary failings.  Rather than owning up to their own fiduciary failings, or taking steps to fully inform themselves, putting a stop to Lululemon's quality-control problems, and holding accountable the individuals whose misconduct had caused material harm to the Company, Defendants claimed publicly in September 2012 to have "worked our way back

---

[7] http://investorplace.com/2013/12/lululemon-stock-lulu/.

from the black Luon setback" and that Lululemon was "well on [its] way to finishing 2013 as a much stronger company than when the year began."

36.     However, in reality, Lululemon continued to suffer from significant quality control problems.   Despite Defendants' public claims in September 2012 that they "really reinvented [Lululemon's] whole quality control process end-to-end to make sure [Lululemon] was delivering a great pant," as *Business Insider* reported on October 31, 2013, "Lululemon Athletica is fielding fresh complaints about the transparency of their yoga pants, and now customers are increasingly reporting a new problem: pilling."   Indeed, numerous Lululemon customers were reporting "pilling" – small balls of fabric that can accumulate on the surface of clothes.   Defendants swiftly and publicly dismissed these concerns, claiming that the Company "didn't have a broader problem" with product quality.

37.     Next, Defendant Wilson **blamed the Company's customers** for Lululemon's quality control problems.   Specifically, on November 5, 2013, in an interview with *Bloomberg TV*, Wilson defended the Company's products by stating that "[q]uite frankly, some women's bodies just actually don't work" [with the pants]…"[i]t's about the rubbing through the thighs, how much pressure is there over a period of time and how much they use it."

38.     On December 12, 2013, Defendants were forced to admit that Lululemon's quality control problems were not limited to products manufactured with black Luon fabric. Defendants further announced that Lululemon's same store sales in the fourth quarter of 2013 were "flat," for the first time in years, directly as a result of quality control issues.   Accordingly, Defendants reduced their previously-issued revenues guidance by $30 million.

39.     Most recently, as reported on January 13, 2014 by the *WSJ* in an article entitled "Supply Chain Problems Dog Lululemon," Defendants announced that Lululemon's sales for the

fiscal quarter ending February 2, 2014 will be weaker than previously expected due to a "meaningful" slowdown.

40.     As the *WSJ* pointed out, "Lululemon face[s] unique problems stemming from last year's recall of its popular model of yoga pants, which, due to a production snafu were see-through when users bent over. Compounding the problem was negative publicity after founder and outgoing Chairman Dennis 'Chip' Wilson seemed to suggest that a new batch of quality problems were in part the fault of overweight customers." According to the *WSJ*, the Company's longtime CFO, Defendant John E. Currie ("Currie"), has publicly admitted that damage to the Company's reputation has substantially slowed sales, and that Lululemon's serious quality-control problems left its stores with inadequate supplies.

41.     On this most recent news, the Company's stock fell by more than 16%, to less than $50 per share. Just prior to the announcement of the Black Luon Recall in March 2013, Lululemon's stock traded for over $70 per share. Thus, the price of Lululemon stock has fallen by nearly 30% in under a year's time, a period when the stock market has soared, well-demonstrating the materiality of Defendants' fiduciary failings with regard to the Company's core business.

42.     Even though the Company suffered massive losses as a result of the fiduciary breaches and other misconduct alleged herein, Defendants Wilson and Day reaped enormous profits. Specifically, during the Relevant Period, Defendants Wilson and Day cashed in their Lululemon stock for proceeds totaling almost *$199 million*. In particular, Wilson sold almost 2.3 million shares of Lululemon stock during the Relevant Period for proceeds of over $184 million. This included $49.5 million in proceeds reaped from sales executed on June 7, 2013, merely *one trading day* before Day's unexpected departure from the Company was announced publicly, and while he and the rest of the Board, but not the public, were aware of Day's

"resignation." Day also sold massive amounts of Lululemon stock during the Relevant Period, for proceeds totaling over $14 million.

43.     The Company has not recovered from Defendants' breaches of fiduciary duty and the events described herein, and the Board has taken no action to recover those substantial damages from those responsible. Absent this derivative lawsuit, those responsible for inflicting material harm upon the Company will not be called to account, and the Company and its shareholders will be irreparably harmed.

## JURISDICTION AND VENUE

44.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

45.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' participation in the wrongful acts detailed herein, occurred in this district. One or more of the Defendants either resides in or maintains offices in this district, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

46.     Plaintiff Thomas Canty is a current shareholder of Lululemon and has continuously held Lululemon stock since June 2011.

47.     Plaintiff Tammy M. Federman is a current shareholder of Lululemon and has continuously held Lululemon stock since May 2010.

48.     Nominal Defendant Lululemon is a Delaware corporation, with its principal executive offices at 400-1818 Cornwall Avenue, Vancouver, British Columbia, V6J1C7, Canada. According to its public filings, Lululemon is a yoga-inspired athletic apparel company.

49.     Defendant Day served as the Company's CEO from July 2008 until January 2014. Day's "resignation" as CEO was announced in June 2013, but Day remained with Lululemon until her successor, Laurent Potdevin, officially took over as CEO in January 2014. In addition, Day served as a director of the Company during this same timeframe.

50.     Defendant Wilson, Lululemon's founder, has been a member of the Board and the Company's largest individual shareholder since 1998. Wilson has served as Chairman of the Board since 1998, but announced in December 2013 that although he will remain on the Board, he intends to "resign" as Chairman shortly before the Company's annual meeting is held in June 2014. Previously, Defendant Wilson served as the Company's Chief Innovation and Branding Officer from March 2010 until January 2012, as its Chief Product Designer from December 2005 until March 2010, and as its CEO from 1998 until 2005. In the Company's most recent Annual Report on Form 10-K with the SEC filed on March 21, 2013, Defendants acknowledged that Wilson "controls a significant percentage of our stock and is able to exercise significant influence over our affairs." Defendants further admit therein that Wilson "is able to influence or control...the election of directors." It has been widely reported by media outlets such as the *WSJ* that since the Company's infancy, Defendant Wilson is an "imposing presence for executives tasked with running the company...he has fashioned an insular and unusual corporate culture, urging rank-and-file employees, executives and directors to attend self-help sessions at the Landmark Forum and complete the Grouse Grind, a 1.2-mile trek up Grouse Mountain near the company's headquarters in Vancouver, British Columbia." In addition, Wilson owns a company called 0823038 BC Ltd., which owns the land and building in which Lululemon's Victoria,

British Columbia store is located.  Lululemon leases the space from 0823038 BC Ltd., with the lease scheduled to continue through June 2017.  Further, under Wilson's direction, Lululemon has retained the Conrad Group, Inc., a company that purports to provide "personal and professional development coaching" to Lululemon personnel, and which is solely owned by Defendant Wilson's sister-in-law, Susanne Conrad.

51.    Defendant Currie has served as the Company's Executive Vice President ("EVP") and CFO since January 2007.

52.    Defendant Waterson served as the Company's Chief Product Officer until April 15, 2013.  Previously, Waterson served as EVP, General Merchandise Management and Sourcing, beginning in June 2008.

53.    Defendant Martha A.M. (Marti) Morfitt ("Morfitt") has served as a director of the Company since December 2008.  In addition, Defendant Morfitt served as Chair of the Company's Audit Committee (the "Audit Committee") during the Relevant Period.

54.    Defendant Michael Casey ("Casey") has served as a director of the Company since October 2007.  In addition, Defendant Casey served as Chair of the Company's Nominating and Governance Committee (the "Governance Committee") and as a member of the Audit Committee during the Relevant Period.

55.    Defendant Robert Bensoussan ("Bensoussan") has served as a director of the Company since January 2013.  In addition, Defendant Bensoussan served as a member of the Governance Committee during the Relevant Period.

56.    Defendant RoAnn Costin ("Costin") has served as a director of the Company since March 2007.

57.    Defendant William Glenn ("Glenn") has served as a director of the Company since December 2012.    In addition, Defendant Glenn served as a member of the Audit Committee during the Relevant Period.

58.    Defendant Rhoda M. Pitcher ("Pitcher") has served as a director of the Company since December 2005.    In addition, Defendant Pitcher served as a member of the Governance Committee during the Relevant Period.

59.    Defendant Thomas G. Stemberg ("Stemberg") has served as a director of the Company since December 2005.    In addition, Defendant Stemberg served as a member of the Governance Committee during the Relevant Period.

60.    Defendant Jerry Stritzke ("Stritzke") has served as a director of the Company since June 2012.

61.    Defendant Emily White ("White") has served as a director of the Company since November 2011.    In addition, Defendant White served as a member of the Audit Committee during the Relevant Period.

62.    Collectively, Defendants Day, Wilson, Waterson, Currie, Morfitt, Casey, Bensoussan, Costin, Glenn, Pitcher, Stemberg, Stritzke and White shall be referred to herein as "Defendants."

63.    Collectively, Defendants Morfitt, Casey, Glenn and White shall be referred to as the "Audit Committee Defendants."

64.    Collectively, Defendants Casey, Bensoussan, Pitcher and Stemberg shall be referred to as the "Governance Committee Defendants."

**DEFENDANTS' DUTIES**

65.    By reason of their positions as officers, directors, and/or fiduciaries of Lululemon and because of their ability to control the business and corporate affairs of Lululemon,

Defendants owed Lululemon and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Lululemon in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Lululemon and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Lululemon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

66.    Defendants, because of their positions of control and authority as directors and/or officers of Lululemon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Lululemon, each of the Defendants had knowledge of material non-public information regarding the Company.

67.    To discharge their duties, the officers and directors of Lululemon were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Lululemon were required to, among other things:

    a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

68.    Pursuant to the Governance Committee's Charter, one of the purposes of the Governance Committee (and thus one of the requirements for all Governance Committee members) is to provide regular updates to the Board on CEO and senior executive succession planning.  According to the Governance Committee's Charter:

> The Board views executive succession planning, as well as supporting leadership development programs, as two of its key responsibilities. These activities are integral to the Company's overall success. With support from the Committee and Management, the Board annually reviews a detailed report on succession planning and leadership development that covers: (1) our leadership competencies; (2) the programs that support the growth and development of our current and future generation of leaders; and (3) our bench strength including identification of potential successors for each executive role, as well as other pivotal roles that are critical to the Company's success.

69.    Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

a.    Review with the management the quality and adequacy of internal controls that could significantly affect the Company's financial statements, and review any special audit steps adopted in light of material control deficiencies;

b.    Review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, or the performance of the internal audit function;

c.    Discuss with management the quality and adequacy of the Company's disclosure controls and procedures;

d.    Review the Company's internal quality-control procedures, other matters relating to the accounting procedures and the books and records of the Company and the correction of controls deemed to be deficient;

e.    Review any material issues raised by the most recent internal quality-control review, or peer review, of the Company, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues;

f.    Review the status of compliance with laws, regulations, and internal procedures, contingent liabilities and risks that may be material to the Company, the scope and status of systems designed to assure the Company's

compliance with laws, regulations and internal procedures, through receiving reports from management, legal counsel and other third parties as determined by the Committee on such matters, as well as major legislative and regulatory developments, including pronouncements by the Financial Accounting Standards Board, the SEC, the Canadian securities regulatory authorities and other agencies or bodies, on the Company's financial statements;

g.  Meet periodically, but no less than quarterly, with management, the Company's risk and compliance team and the Company's independent auditors to review and discuss the Company's significant financial risk exposures and the steps that management has taken to monitor, control and report such risks;

h.  Regularly evaluate the Company's policies, procedures and practices with respect to enterprise risk assessment and risk management;

i.  Review with the Company's counsel legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or governmental agencies;

j.  Review the Company's earnings press releases, including the use of "pro-forma" or "adjusted" non-GAAP information (subject to compliance with law and applicable SEC rules, including Regulation G), as well as other publicly disclosed financial information and earnings guidance, prior to the issuance of any earnings press release, and discuss any of the foregoing with management to the extent desired by any member of the Committee;

k.  Meet to review and discuss with management the Company's quarterly and annual financial statements on Form 10-Q and 10-K, respectively; and

l.  review and approve any transactions between the Company and related parties in accordance with the Company's Related Party Transaction Policies and Procedures.

## SUBSTANTIVE ALLEGATIONS

**A.    Overview of the Company and its Problems**

70.  Lululemon, founded by Wilson in 1998, is a designer and retailer of technical athletic apparel.  The Company – which opened its first store in 2000 and went public in 2007 – derives virtually all of its revenue from designing and selling athletic apparel and accessories, such as yoga pants, shorts, and tops.  Lululemon's business model is based on selling its

garments at high prices (approximately $100 for one pair of pants and $60 for one shirt), offering minimal discounts, and keeping a very small inventory of products in its stores in order to drive demand.  As the *WSJ* recently reported on January 13, 2014,  Lululemon has historically "fueled demand by purposely keeping product scarce, a strategy that helped it maintain premium prices and post outsize sales gains."

71.    While Lululemon offers a comprehensive line of clothing, its most important and popular products are its women's fitness pants designed from a proprietary material known as "Luon," a blend of 86% nylon and 14% Lycra.  All of the Company's tighter-fitting silhouette "bottoms," including its popular Groove Pants, Wonder Crops, Astro Pants, Skinny Will Leggings and Gather & Crow Crops, are manufactured from Luon fabric.  Before the Relevant Period, black-colored Luon bottoms alone accounted for at least 17% of the Company's sales of women's bottoms, and 6% of the Company's total sales – or $80 million during 2012 alone.  In addition to being the Company's most popular products, black Luon bottoms also have one of the highest profit margins of any of Lululemon's products, and sales of these bottoms often result in additional "add-on" sales of other Lululemon products.

72.    While Luon is the primary fabric found in most of the Company's performance-wear products, Luon is not actually manufactured by Lululemon itself.  Rather, Lululemon contracts with manufacturers for the production of all of its products, including its core Luon-based products.  Lululemon's Luon-based garments have, for the past ten years, been produced by Eclat, a company based in Taiwan.

**B.    Lululemon's Business Plan Is Premised On The Purported "Premium Quality" Of Its Products**

73.    Throughout the Relevant Period, Lululemon's business model (as designed by Defendants) was based upon selling fitness apparel of superior quality than that of its

competitors, and selling that apparel at higher prices than those competitors. For example, one of Lululemon's most significant, revenue-driving, core products – its black-colored Luon yoga pants – retail for approximately $100 per pair, while its primary competitors sell very similar pants for 30% less.

74. Defendants justified the Company's exorbitant prices by emphasizing the "premium quality" of its products. For instance, in Lululemon's Relevant Period SEC filings, Defendants credited the Company's "premium," "high quality" and "innovative, technical" products for its "competitive advantage" and "strong financial performance." In Lululemon's Form 10-K for fiscal year 2012, filed with the SEC on March 21, 2013, Defendants stated that what purportedly "differentiates" the Company from its competitors and drives its "competitive strength" is that it offers "superior" and "high-quality premium apparel that is designed for performance, comfort, functionality and style."

75. During the Company's investor conference calls both prior to and during the Relevant Period, certain of the Defendants also regularly noted how Lululemon's "high quality" products gave the Company a competitive advantage. For example, on the Company's January 11, 2012 investor conference call, Day represented that the Company's high product quality is a "point[] of differentiation" that "allows the Company to deliver that world-class business model." Just days later, on a January 20, 2012 investor conference call, Defendants reported that the Company's product quality was what set Lululemon apart from its competitors, noting that "it is very difficult for competition to compete with [Lululemon] on quality."

76. Maintaining high product quality at all times was and is essential to the Company's "ability to maintain the value and reputation" of its brand. Defendants specifically acknowledged that "maintaining, promoting and positioning its brand" depended largely on the Company's ability "to provide a consistent, high quality guest experience," and any "negative

publicity regarding the production methods of any of our suppliers or manufacturers could adversely affect [its] reputation and sales." As Defendant Day announced during the Company's September 7, 2012 investor conference call, "[i]n the end, quality is our key differentiating factor. It is what [Lululemon] stands for and what [Lululemon] will always stand behind."

77.    Given the significant role that core products manufactured with Luon fabric played in Lululemon's growth and financial success, maintaining high-quality Luon products was especially important to the Company's business prospects both before and during the Relevant Period. Indeed, on June 10, 2011, Day stated publicly that "Luon has been the same for over 7 years" and that the Company was purportedly "maniacal about protecting that standard." Day also represented that the Company "monitor[s] the quality and feedback on [its Luon] items in particular."

78.    Because "superior," "high quality" products, including products made with Luon fabric, were so critical to Lululemon's "competitive advantage" and "strong financial performance," Defendants also touted the Company's "close collaboration" with an independent product testing company and its suppliers and manufacturers. For example, in the Company's 2012 Form 10-K, Defendants emphasized how closely the Company's design team purportedly worked with "a leading independent inspection, verification, testing and certification company" – which, as discussed herein, former Lululemon employees confirmed was SGS S.A. ("SGS")[8] – to "conduct[] a battery of tests before each season on our fabrics, testing for a variety of performance characteristics including pilling, shrinkage, abrasion resistance and colorfastness."

---

[8] While Plaintiffs and Plaintiffs' Counsel have conducted their own independent investigation into the matters alleged herein, all of the allegations based on the accounts of confidential witnesses ("CWs") are contained in the Consolidated Amended Class Action Complaint filed on January 15, 2014 in the related securities fraud class action pending in this Court captioned *In re Lululemon Securities Litigation*, Civil Action No. 13-CV-4596 (KBF) (the "Securities Action").

79.     Defendants also emphasized that the Company "developed long-standing relationships with a number of [] vendors" and that it "take[s] great care to ensure that [such vendors] share [Lululemon's] commitment to quality and ethics." Similarly, on the Company's pre-Relevant Period investor conference calls, Defendants emphasized that the Company utilized "just a very small handful of factories" and "a very small base of manufacturers" so that it "can really control the quality of the fabric" and the products, and claimed that it conducted "multiyear capacity-planning exercises" with its factory partners to ensure that the factories met high quality standards.

80.     Analysts also focused on the Company's quality controls, recognizing its paramount importance to Lululemon's business plan and prospects. For example, in a February 14, 2013 analyst report – which of course was issued following the well-publicized quality control issues Lululemon experienced in 2011 and 2012 -- Morgan Stanley noted that "persistent quality issues, even minor ones" could "risk damaging LULU's brand image" and "open[] the door for competition," and that if Lululemon customers "believe there is less of a quality difference between LULU's offerings and the competition's lower-priced ones," they will "switch to cheaper alternatives." The analysts continued, "[t]he Street is worried about competitors impacting LULU, but *we are more worried about what LULU may do to itself* . . . We believe *LULU must take steps to ensure it maintains the highest quality product standards* in the industry in order to maintain its leadership position vs. competitors."

**C.    Lululemon's Purportedly "Superior" Quality Luon Products Spur The Company's Astronomical Growth**

81.     Defendants' public representations regarding the Company's "highest in the industry" quality standards drove customers to purchase Lululemon's high-priced Luon products. For example, in a nationwide survey of 300 Lululemon customers reported by the analyst firm

Wedbush, customers overwhelmingly cited "quality" as the reason why they buy Lululemon products:



82.     If Lululemon was unable to produce high quality products, however, there would be little justification for these Lululemon customers to pay 30% more for products that were very similar in design and functionality to those sold by Lululemon's primary competitors, such as Gap, Nike, and numerous others.

83.     The Company's apparel sales led to enormous growth. In just a few short years, from 2009 to 2012, Lululemon quadrupled its annual revenues to $1.37 billion, quadrupled its gross profits to $763 million, and more than doubled its number of stores to over 200.  During this same time period, the Company nearly doubled its sales per square foot of retail space, increasing from $1,318 in fiscal 2009 to $2,058 in sales per square foot in fiscal 2012.  In 2012, Lululemon ranked third-highest in North America in sales per square feet, behind only Apple and Tiffany & Co.

84.     During the period from 2009 through 2012, Lululemon also met or exceeded analyst expectations for virtually all key financial metrics.  Specifically, Lululemon beat analyst expectations for sales, gross margin, and EPS for fiscal years 2009, 2010, 2011, and 2012.

85.     Fueled by its strong financial results, the price of Lululemon stock increased dramatically, from approximately $4 per share at the beginning of 2009 to approximately $70 per share at the end of 2012, an increase of more than 1,650% in only four years.  Lululemon's core black-colored Luon products, a significant driver of the Company's sales, contributed substantially to this success.

86.     While Day claimed publicly that Lululemon's growth did not come "at any cost," internally the Defendants had determined to sacrifice quality control for rapid growth. Numerous former employees have described how Defendants were singularly focused on growing the Company at the expense of quality control.

87.     For example, it has been alleged that CW 2, a Vice President of Product Operational Solutions at Lululemon's headquarters from September 2011 through December 2012, stated that the Company failed to make quality control a priority because it was "focus[ed] on growth, growing stores ... and expanding their reach[.]" It has similarly been alleged that CW 3, a Sourcing Manager at Lululemon between August 2012 and July 2013 who was responsible for the Company's Run and Tripod categories (which included swim, underwear, cycling and seamless products), has stated that while Lululemon's marketing achievements were impressive, "they just didn't put the structures in place for quality procedures." It has been alleged that CW 4, who worked as a Sourcing Manager at Lululemon's headquarters from July 2007 through July 2012 and was responsible for managing part of Lululemon's supply chain, for sourcing finished goods and managing factory relationships, similarly explained that the Company's quality team was "strained" because Lululemon "was growing so fast," resulting in a number of instances in which quality was negatively impacted. It has been alleged that CW 5, Lululemon's Lead Raw Material Developer from July 2011 through January 2013, who worked from the Company's headquarters with both designers and the development team to find and test fabrics for use in

Lululemon's products, also reported that the Company's aggressive growth plan "definitely" impacted product quality, describing Lululemon as "a house of cards; it just grew too fast."

88.     Indeed, both Wilson and Day have admitted that Lululemon "sacrificed" quality control in order to grow the Company.  For example, Wilson publicly conceded after the Black Luon Recall to *Fortune* magazine that, "we probably weren't growing [the] quality-control part of the company as fast as the company."  Similarly, it has been alleged that CW 6, who was a Quality Assurance Manager in IT at Lululemon's headquarters from September 2008 through August 2013, reported that Defendant Day admitted internally to employees in the winter of 2012-2013, in so many words, that "quality was sacrificed" because of the "sheer volume and the vast growth" of the Company.

### D.     The Board Failed to Take Action In Response to a Series Of Red Flags Reflecting The Company's Lack Of Adequate Quality Controls

89.     Prior to the Black Luon Recall, Lululemon suffered a series of highly-publicized and embarrassing quality control failures that placed all of the Defendants, including all of the members of the Board, on notice that there were serious problems with the Company's quality controls.

90.     Beginning in 2007, Lululemon produced and sold products that it claimed at the time contained beneficial "marine amino acids" from seaweed that "release[d] marine amino acids, minerals and vitamins into the skin upon contact with moisture," and could reduce stress and provide anti-inflammatory, antibacterial, hydrating and detoxifying benefits to wearers.  In a November 2007 exposé (discussed in detail below) entitled "'Seaweed' Clothing Has None, Tests Show," *The New York Times* reported that it commissioned an independent lab to test Lululemon's VitaSea products and that the lab found no significant difference in mineral levels between the VitaSea shirts – which sold for $59 each – and ordinary $20 cotton T-shirts.

91.     In the wake of *The New York Times* exposé, Defendant Wilson – who was serving as the Company's Chief Product Designer and Chairman of the Board – was forced to admit that the Company had not even bothered to test the VitaSea material to see whether Lululemon's claims about the material were true.

92.     Analysts were stunned by the *New York Times*' findings and Defendants' admissions.  For example, William Blair & Co. stated: "It's frankly up to the companies to do sporadic quality tests to make sure everything is manufactured to the parameters they set.  At the end of the day, it's Lululemon's name on the line."

93.     Further, citing Canada's Textile Labeling Act, Canada's Competition Bureau forced Lululemon to remove all claims of alleged therapeutic benefits from its VitaSea line of clothing, publicly stating that Lululemon's claims of alleged health benefits were "questionable."

94.     In December 2010, another high-profile quality failure was reported.  This time, the Company, which Defendants have consistently held out as green-minded and organic, shipped and distributed shopping bags beginning in February 2010 to coincide with the Vancouver Winter Olympics that were printed using ink that contained high levels of lead.  According to Defendants, the problematic bags were used for more than a year and were manufactured by a supplier located in China.

95.     Defendants hoped to avoid disclosure of this quality-control failure.  Although Lululemon employees were informed that the shopping bags contained an unknown amount of lead, they were instructed to return the bags days before notices were issued to the public informing customers of the product defect.  Indeed, according to the *Edmonton Journal*, Defendants only caused Lululemon to notify the public *after* the newspaper contacted the Company about the lead issue.  In a press release issued on December 21, 2010, Day assured Lululemon's customers and investors that such product quality issues would not occur in the

future, and represented that Lululemon "choose[s its] partners carefully and the manufacturer of the [bags] is known for its green practices, and is cooperating fully with our review."

96.     In 2011 and 2012, Lululemon experienced more material quality control issues, and in these instances, these issues implicated core products. Specifically, in late 2011 and early 2012, numerous Lululemon customers complained that Lululemon's garments were defective because their colors bled during exercise. This leaching dye stained customers' skin and hair, required multiple washes to remove, and caused serious health concerns. These problems affected several of Lululemon's fabrics, ***including Luon***, and were so pervasive that the Company placed warnings on the defective items and/or pulled them from store shelves, and stated that it would accept returns, *carte-blanche*, for any affected item. Former Lululemon employees confirmed the severity of this quality control failure.

97.     It has been alleged that according to CW 7, a Women's Designer at Lululemon headquarters from June 2011 through May 2012, the color-bleeding issue was a significant problem, affecting a large amount of product. It has been alleged that CW 1 similarly stated that "color fastness was a huge issue for a long time," and impacted "all [Lululemon's] colored pants." It has been alleged that CW 1 explained that the color fastness issue was particularly problematic because it often impacted customers' other property, leading to "a lot of irate customers."

98.     The Company lacked sufficient quality control procedures to catch the color-bleeding problems prior to shipment. Remarkably, at no point were any of the affected products laundered, treated with water, or subjected to sweat – all typical and expected uses of the products and standard means of testing such products – to see how they performed prior to shipment to stores. Indeed, it has been alleged that according to CW 8, who served as Lululemon's Technical Operator of its e-commerce website from 2011 through March 2013 and

worked for Lululemon for more than 7 years, the Company did not even know what caused the color-bleeding issue to occur until weeks after the products had been on store shelves and sold to customers.

99.   It has been alleged that according to former Lululemon employees, Day and other senior Company officers, including the Chief Product Officer, Defendant Waterson, who reported directly to Defendant Day, were aware of the color-bleeding product quality issues – like they were of all quality control issues – shortly after they came to light. For example, it has been alleged that CW 2 recounted that Day was well-aware of the color-bleeding product quality issues as they occurred, and it has been alleged that CW 1 recounted that at the Company's annual manager conference in October 2012, Day "made a commitment" to resolve the Company's color fastness issues.

100.   Defendants were put on notice of yet another product quality control failure, in the spring of 2012, when Lululemon shipped swimwear which was prone to both color bleeding and sheerness problems. Specifically, certain swimwear bled when in contact with sweat or water, while other swimwear became completely sheer when it became wet – in other words, the products were virtually useless for their intended functions.

101.   It has been alleged in the Securities Action that yet another product failure occurred shortly before the Relevant Period, one which Lululemon did not publicly disclose to its "guests" or to the market. In June 2012, shortly after the color-bleeding issues came to light, a change was made to the type of elastic used in the waistband of Lululemon's men's athletic shorts. According to CW 9, a Merchant in Lululemon's Men's Division from January 2012 through September 2012, the new elastic did not retain its elasticity, which would result in the shorts falling down once the customer put anything into the pockets of the shorts. CW 9 explained that Lululemon's quality controls failed to identify this problem before the shorts were

shipped to stores. Rather, the problem was identified through feedback from store managers and customers. Because it was unclear which product batches were defective, CW 9 explained that Lululemon's corporate headquarters asked its store managers to test the shorts to determine whether they were affected. If the product contained the problematic elastic, the store managers pulled them from the store. As was the case with the black Luon pants, had the Company put basic product testing in place, specifically the method of using a live model to try on the shorts prior to shipment, the defect would have been readily discovered before the products were shipped to stores or purchased by customers.

102.    Notably, Lululemon's senior executives were informed about and involved in each of these quality control breakdowns. It has been alleged that CW 2 stated that beginning in late 2011 when the "severity of the [product quality] issues" started to become apparent, Day "would be notified" about "pretty much everything that happened" with respect to product quality issues in regular reports. It has been alleged that CW 10 also reported that when a product quality issue was "bad," it would be elevated to Day. Both of these former Lululemon employees confirm that these practices continued throughout their tenures at the Company and during the Relevant Period. Wilson also knew about, or recklessly disregarded, the Company's repeated quality control failings. According to press reports, even after he resigned from Lululemon's management team (but while he was serving as Chairman of the Board during the Relevant Period), Wilson continued to "dip[] in and out of daily affairs at Lululemon" and "his fingerprints are all over the company's policies and principles." It has been alleged that CW 2 confirmed Wilson's active involvement in the day-to-day management of the Company.

**E.**     **Defendants' Failure To Heed The Numerous Red Flags Reflecting The Company's Failure to Maintain Quality Control Processes Results In The Most Damaging Product Recall In The Company's History**

103.    As a result of these issues, Defendants went to great efforts to assure the Company's customers and the market that the quality problems were fixed.  For example, after the color-bleeding issues became public and Lululemon's customers demanded answers, Defendants apologized for the Company's repeated quality control issues in a July 2012 letter from Defendant Waterson, the Chief Product Officer, that was posted on Lululemon's Facebook page.

104.    In the July 2012 letter, Defendants represented that "quality is [Lululemon's] hallmark," that the Company had put "stringent testing procedures in place" to rectify the problems, and that all of the Company's products now "met [Lululemon's] performance requirements."  Defendants also claimed that they had "brought in the leading fabric and dye expert, along with additional on-site quality inspection at every stage to identify potential causes" of its color-bleeding issues.  Accordingly, the Defendants, including all of the members of the Board, were undeniably unaware of the Company's quality control issues at the time this "open letter" was published.

105.    Then, on September 7, 2012, in response to questions about the widespread color bleeding of Lululemon's products, Day stated that while the Company may have "pushed" the color limit too far, its products were "created using the highest quality suppliers and manufacturers," and that the Company now "stood behind" its supposed high-quality products. Day further represented that the color-bleeding defect was a small, isolated issue, and assured the public that the Company's supply chain was being closely monitored, that its mills were making investments in new equipment and employees, and that the Company was focused on its suppliers' "capability and [the Company's] capability delivering quality every step of the way."